**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Apolonia GALVAN, a/k/a Paula Galvan, Defendant–Appellant.**

**Nos. 90–2589, 90–2590.**

United States Court of Appeals, Fifth Circuit.

Dec. 18, 1991.

---

Thomas W. McQuage (court-appointed), Galveston, Tex., for defendant-appellant.

Paula C. Offenhauser, Asst. U.S. Atty., and Ronald G. Woods, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, WILLIAMS and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

Apolonia Galvan appeals her conviction for three counts of attempting to kill a cooperating witness/informer, contending that two are multiplicious and that the evidence was insufficient to support one of them. She also asserts that the evidence was insufficient to support her conviction on two counts of illegal possession of a firearm and that the district court relied on erroneous information in sentencing her on these counts and on her guilty plea to a drug offense. We AFFIRM.

## I.

As part of an investigation of organizations believed to be trafficking drugs, agents initiated electronic surveillance of the Hernandez Organization. A wiretap conducted between August and October 1987 uncovered a distribution network and implicated over 50 targets. The kingpin, Albert Salinas, Jr., employed Apolonia Galvan to consummate various narcotics transactions. Between March and October 1987, agents recorded conversations between Galvan and Salinas, in which they discussed transactions involving over 2000 grams of cocaine and over 2000 pounds of marijuana.

In the fall of 1986, Raul Herrera, on parole from a state drug conviction involving heroin, contacted the FBI and volunteered to serve as a confidential informer. Over a two year period beginning that fall, and in connection with the FBI's "Operation White Gold", Herrera participated in numerous controlled meetings and telephone calls with targeted individuals, including Galvan.

In March 1987, Galvan met with Herrera on several occasions under videotape surveillance at his apartment. On one occasion in early March, she offered to supply him kilogram quantities of cocaine. Later that month, they negotiated a 1000–pound delivery of marijuana. That same day, Galvan sold a one and one-half pound sample of marijuana to Herrera. In June 1987 at Galvan's house, they again discussed a kilogram cocaine transaction, while Herrera was wearing a concealed recorder.

Herrera negotiated, however, an illegal cocaine transaction with Salinas, during the course of a wiretap of Salinas. In November 1988, Herrera was arrested and indicted along with other individuals, including Galvan, targeted in Operation White Gold. Both Galvan and Herrera were released on bond.

On May 15, 1989, transcripts of recorded conversations between Herrera and targeted individuals were released. Four days later, Herrera pleaded guilty to unlawful use of a communication device to facilitate the commission of a felony. In exchange, he agreed to testify against the other defendants in the drug conspiracy proceeding.

On May 20, 1989, Herrera was in his apartment. He admitted his brother, Eddie Herrera (Eddie), and Galvan; and Eddie

began trying to restrain him. Galvan shouted remarks about Herrera being "wired" and working with the FBI to videotape drug transactions involving her. She fired three shots at him, hitting him each time; she and Eddie then departed. Herrera retrieved his own handgun. He opened the door and overheard Galvan say "I'm going to go back and finish him off". He shot at her as she opened the front door and at her and Eddie as they fled. Galvan turned herself in to the police, and Herrera recovered from his injuries. Galvan's gun was never recovered.

In the drug conspiracy proceeding, a March 1990 superseding information charged Galvan with conspiracy to possess with intent to distribute less than 50 kilograms of marijuana, during the period before October 1986 to late October 1987, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 846. She pleaded guilty in March 1990, after trial earlier that month of the witness tampering proceeding.

In that proceeding, Galvan was charged by superseding indictment in August 1989 with: attempting to kill a person with intent to prevent his attendance at an official proceeding, in violation of 18 U.S.C. § 1512(a)(1)(A) (count 1); attempting to kill a person with intent to prevent his communication to law enforcement officials and a federal judge of information about the commission of a federal offense, in violation of 18 U.S.C. § 1512(a)(1)(C) (count 2); retaliation against a witness-informer, in violation of 18 U.S.C. § 1513(a)(2) (count 3); illegal receipt of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) (count 4); and illegal receipt of a firearm while under indictment for a felony, in violation of 18 U.S.C. § 922(n) (count 5). In March 1990, a jury convicted her on all counts.

Galvan was sentenced jointly for both sets of offenses. For the drug offense, she was sentenced (pre-guidelines) to 10 years'

imprisonment, to run concurrently with her sentence in the witness tampering proceeding, a $50 special assessment, and a four-year special parole term, to run concurrently with the supervised release term in the witness tampering proceeding. In the witness tampering proceeding, she was sentenced (under the guidelines) to 188 months each on counts one and two; 120 months each on counts three and four; and 60 months on count five, all to run concurrently with each other and with the sentence in the drug conspiracy proceeding, along with three years' supervised release, and a $250 special assessment. The district court also ordered that Galvan pay restitution to Raul Herrera for expenses in the amount of $7,721.88.

## II.

Galvan contends that her convictions and sentences for the witness offenses under 18 U.S.C. § 1512 are multiplicious.[1] She likewise challenges the sufficiency of the evidence (1) that she attempted to kill Herrera with the intent to prevent his communication of information relating to a federal crime; and (2) that the firearm she was convicted of possessing traveled in interstate commerce. Finally, Galvan contends that the information the district court relied on in sentencing was unreliable and that she should be granted a new sentencing hearing.

## A.

Galvan maintains that her convictions and sentences for violating 18 U.S.C. §§ 1512(a)(1)(A) (attempting to kill person to prevent his attendance at an official proceeding) and 1512(a)(1)(C) (attempting to kill person to prevent his communication of information relating to the commission of a federal offense) are multiplicious and, therefore, violate the Fifth Amendment proscription against double jeopardy.[2]

---

1. Although at one point in her brief Galvan raises the multipliciousness of all three witness counts, she argues only that the two counts brought pursuant to 18 U.S.C. § 1512 are multiplicious.

2. 18 U.S.C. § 1512 provides in pertinent part:

   (a)(1) Whoever kills or attempts to kill another person, with intent to—

" 'Multiplicity' is charging a single offense in more than one count in an indictment. Accordingly, it 'addresses double jeopardy; and where the jury is allowed to return convictions on multiplicious counts, the remedy is to remand for resentencing, with the government dismissing the count(s) that created the multiplicity.' " *United States v. Lemons,* 941 F.2d 309, 317 (5th Cir.1991) (quoting *United States v. Moody,* 923 F.2d 341, 347 (5th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 80, 116 L.Ed.2d 54 (1991)). " 'The chief danger raised by a multiplicious indictment is the possibility that the defendant will receive more than one sentence for a single offense.' " *Id.* (quoting *United States v. Swaim,* 757 F.2d 1530, 1537 (5th Cir.), *cert. denied,* 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985)).

■ Conceding that she did not raise this issue in the district court, Galvan contends, nevertheless, that she may raise it on appeal. As discussed *infra,* she is, in part, correct: she may challenge multiplicity of sentences. To preserve for appeal an objection based on multiplicity of the indictment, the defendant must raise it in a pretrial motion pursuant to Fed.R.Crim.P. 12(b). *United States v. Munoz–Romo,* 947 F.2d 170, 174 (5th Cir.1991); *United States v. Stovall,* 825 F.2d 817, 821 (5th Cir.1987). By not doing so, a defendant waives her objection to multiplicity in the indictment. *Munoz–Romo,* 947 F.2d at 174; *Lemons,* 941 F.2d at 316 n. 4. As noted, Galvan acknowledges not having filed the requisite pre-trial motion; because she did not, she may not challenge the convictions as multiplicious.

But, as we stated in *Munoz–Romo:*

Despite this waiver, "[a] complaint about multiplicity of sentences ... can be raised for the first time on appeal." *Stovall,* 825 F.2d at 821. But, if the sentences are to be served concurrently, a defendant is still precluded from asserting a multiplicity claim not raised prior to trial. [*United States v.* ] *Marroquin,* 885 F.2d [1240,] 1245 [ (5th Cir. 1989), *cert. denied,* 494 U.S. 1079, 110 S.Ct. 1807, 108 L.Ed.2d 938 (1990) ]. However, if monetary assessments under 18 U.S.C. § 3013 are imposed on separate counts of conviction, the sentences on those counts are not concurrent, and the concurrent sentence doctrine does not apply. *Ray v. United States,* 481 U.S. 736, 736–37, 107 S.Ct. 2093, 2093–94, 95 L.Ed.2d 693 (1987); *Marroquin,* 885 F.2d at 1245.

947 F.2d at 174. As noted, a $50 special assessment was imposed against Galvan on each count of conviction. Accordingly, on appeal she may raise multiplicity of sentences. *See id.* at 175.

■ In deciding whether Galvan is correct that Congress did not intend to permit multiple punishments for violations of §§ 1512(a)(1)(A) and (C), "our starting point must be the language of the statute[ ]." *Albernaz v. United States,* 450 U.S. 333, 336, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981). "Absent a 'clearly expressed legislative intention to the contrary, the language must ordinarily be regarded as conclusive.' " *Id.* (quoting *Consumers Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). And, to decide whether two statutory offenses may be punished cumulatively, we next apply the test enunciated in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Albernaz,* 450 U.S. at 337, 101 S.Ct. at 1141; *Munoz–Romo,* 947 F.2d at 175.

'The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' *Albernaz,* 450 U.S. at 337, 101 S.Ct. at 1141 (quoting *Whalen v. United States,* 445 U.S.

(A) prevent the attendance or testimony of any person in an official proceeding; [or]

. . . . .

(C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission ... of a Federal offense

. . . . .

shall be punished as provided in paragraph (2).

684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)). However, as noted, "the *Blockburger* test does not control in the face of clearly expressed contrary legislative intent." *Munoz-Romo,* 947 F.2d at 175 (citing *United States v. York,* 888 F.2d 1050, 1058 (5th Cir.1989)).

■ Galvan was convicted of violating two provisions in the same statute, not two different statutes. Of course, our analysis is the same, whether the asserted multiplicity is the result of a conviction under two statutes or, instead, subparts of a subsection of a single statute, as here. *Munoz-Romo,* 947 F.2d at 175. We therefore consider whether the plain wording of the statute and any legislative intent permit multiple punishments. Nothing in the statute suggests that a single attempted killing cannot, at the same time, violate more than one of the three subparts of § 1512(a)(1). As long as a defendant is charged with possessing the intent forbidden by the appropriate subparts, the plain language of the statute does not protect her from multiple punishments arising out of the same act. Likewise, we find no legislative history, nor are we cited to any, that expresses any view on whether multiple punishments for the same act of attempted killing are permissible.[3]

Lastly, we evaluate "whether each provision requires proof of a fact which the other does not." In *United States v. Maggitt,* 784 F.2d 590 (5th Cir.1986), this court rejected a multiplicity challenge to an indictment charging witness tampering under former § 1512(a) (now § 1512(b)) and retaliation against a witness in violation of § 1513. The court noted that the facts necessary to prove the two offenses were different. Under § 1512, it was necessary to prove, *inter alia,* "that the intended victim was to participate in a pending or future proceeding." *Id.* at 599. This was distinguished from the proof required for § 1513, in which "the Government must establish that the victim had given testimony previously and that the defendant's acts were intended to be in retaliation for the prior testimony." *Id.*

Likewise, in this case, each of the subsections requires proof of a fact different from the other. To support a conviction for violation of § 1512(a)(1)(A), the government must prove that the defendant intended to prevent the victim's attendance or testimony at an official proceeding. A conviction under § 1512(a)(1)(C) requires proof of a different fact; namely, that the defendant intended to prevent the victim from communicating information relating to the commission of a federal crime (*see* part II.B.). The sentences are not multiplicious.

### B.

■ On appeal, Galvan challenges, for the first time, the sufficiency of the evidence to support her conviction under count 2 (violation of § 1512(a)(1)(C)). She contends there was no evidence that she attempted to kill Herrera with the intent to prevent his communication to federal officials of information relating to the commission of a federal crime. She admits that the government adduced sufficient evidence that she intended to prevent his testimony at an official proceeding (count 1) and to retaliate against him for his prior activities as an informer (count 3).

Again, Galvan concedes that she did not raise this issue at trial. She neither moved for a directed verdict at the close of the evidence nor for judgment of acquittal following trial. "Consequently, this [c]ourt's review is not under the usual standard of review for claims of insufficiency of evidence but rather under a much stricter standard." *United States v. Ruiz,* 860

---

**3.** Subsection (a) of § 1512 was added by Pub.L. 99–646 (1986). The Judiciary Committee section-by-section analysis accompanying the bill specifies only that:

> Section 44 of the bill amends 18 U.S.C. 1512, which deals with witness intimidation, by inserting a new subsection dealing explicitly with killing or attempting to kill a Federal witness. In *United States v. Dawlett,* No. 85–1047 [787 F.2d 771] (1st Cir. April 2, 1986), the First Circuit held that killing a witness did not constitute an attempt to influence that person's testimony under 18 U.S.C. 1512. Section 44 overturns *Dawlett* and amends 18 U.S.C. 1512 expressly to include killing or attempting to kill a Federal witness.

1986 U.S.C.C.A.N. 6153.

F.2d 615, 617 (5th Cir.1988). "We are limited to the determination of 'whether there was a manifest miscarriage of justice.' Such a miscarriage would exist only if the record is 'devoid of evidence pointing to guilt,' or ... 'because the evidence on a key element of the offense was so tenuous that a conviction would be shocking.'" *Id.* (quoting *United States v. Ivory*, 468 F.2d 613, 614 (5th Cir.1972) and *United States v. Bullock*, 551 F.2d 1377, 1385 (5th Cir. 1977)). "In making this determination, the evidence, as with the regular standard for review for insufficiency of evidence claims, must be considered 'in the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices.'" *Ruiz*, 860 F.2d at 617 (quoting *United States v. Hernandez–Palacios*, 838 F.2d 1346, 1348 (5th Cir.1988)).

Galvan's contention is based on Herrera's no longer serving as a government informer at the time she shot him. She emphasizes that those activities had ceased as of his arrest in November 1988 and that the FBI no longer treated him as a cooperating witness. Therefore, she contends, the jury could not have concluded that she possessed the intent to prevent Herrera's future communication of information regarding the commission of a federal crime.

However, viewing the evidence in the light most favorable to the government, we note that the jury could have inferred that Galvan intended to prevent Herrera from revealing any *additional* information about their prior drug negotiations. And further, because Galvan and Herrera continued to associate with each other after they were released on bond, it was possible for the jury to infer that Galvan intended to prevent Herrera from communicating

information he gleaned from contacts with her after his arrest. Moreover, the statute focuses on the defendant's intent: whether she thought she might be preventing Herrera's future communication of information. The jury was entitled to conclude that Galvan *believed* that she was preventing communication, regardless of the actual likelihood that Herrera would communicate information.

In sum, no manifest miscarriage of justice has occurred; the record is not devoid of evidence on count 2, and a conviction based on that evidence is not shocking.

## C.

■ Galvan challenges her two firearm convictions, again on appeal asserting, for the first time, that the evidence was insufficient that the weapons traveled in interstate commerce.[4] Likewise, because Galvan did not move for a directed verdict or judgment of acquittal on the basis of insufficiency of the evidence, we review her conviction under the manifest miscarriage of justice standard.

Both 18 U.S.C. §§ 922(g)(1) and (n) require that the weapon involved have "been shipped or transported in interstate or foreign commerce." As noted, the gun Galvan used was not recovered and therefore not introduced at trial. The government introduced two bullet slugs recovered, among others, from Herrera's apartment after the shooting. FBI Special Agent Greg Gilliland testified that these bullets were fired from the same gun.[5]

Gilliland also offered the only testimony at trial regarding the location of the gun's manufacture. He testified that, based on the rifling patterns detected on the slugs, the gun that fired them could have been

---

**4.** Galvan was convicted of violating 18 U.S.C. §§ 922(g)(1) and 922(n), which state:
 (g) It shall be unlawful for any person—
  (1) who has been convicted in any court of[ ] a crime punishable by imprisonment for a term exceeding one year;
   .    .    .    .    .    .
 to receive any firearm ... which has been shipped or transported in interstate or foreign commerce.
 . . . .

 (n) It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ... receive any firearm ... which has been shipped or transported in interstate or foreign commerce.

**5.** Galvan does not contest the sufficiency of the evidence linking the slugs found in Herrera's apartment with the weapon she used in shooting Herrera.

manufactured by any of four firms of which he was aware, all located outside of Texas. Gilliland did not know of any Texas manufacturer whose guns would leave a firing pattern like the one he identified. However, on cross-examination, he admitted "a possibility" that a Texas firm could have manufactured the weapon.

Examined in the light most favorable to the government, the evidence that Galvan's firearm traveled in interstate commerce was more than adequate to preclude her conviction on the firearm counts from being manifestly unjust. There is only "a possibility" that the weapon could have been manufactured in Texas. And, viewing Gilliland's testimony as a whole, we do not find that he was overly tentative in his estimation that the weapon was made outside Texas. The jury had ample evidence on which it could find that the weapon had been transported in interstate commerce. As stated, the verdicts on counts 4 and 5 do not constitute a manifest miscarriage of justice.

### D.

Galvan contends that the district court erred in sentencing her, especially on the drug offenses, based on the factual information contained in the presentence report [PSI]. Specifically, she claims that the PSI "went far beyond any of the evidence ... which was offered in the [trial for Herrera's shooting], or the Defendant's plea of guilty to conspiracy...."

■ Because the drug offense occurred prior to November 1, 1987, Galvan was not sentenced for that offense under the Sentencing Guidelines. We review pre-guidelines sentences only for "'gross abuse of the trial judge's broad discretion.'" *United States v. Webster*, 750 F.2d 307, 340 (5th Cir.1984) (quoting *United States v. Robinson*, 700 F.2d 205, 214 (5th Cir.1983), *cert. denied*, 465 U.S. 1008, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984)), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). Due process requires that the information that the trial judge

relies on in sentencing have "some minimal indicium of reliability" and "bear some rational relationship to the decision to impose a particular sentence." *United States v. Fulbright*, 804 F.2d 847, 853 (5th Cir.1986). The defendant bears the burden of proving that the information considered in sentencing is "materially untrue". *United States v. Flores*, 875 F.2d 1110, 1113 (5th Cir. 1989).

■ Galvan was sentenced under the guidelines for the five counts in the Herrera shooting proceeding. "The standard of review regarding guideline sentencing is statutorily defined. The sentences assessed must be upheld unless the appellant[ ] demonstrate[s] that they were imposed in violation of the law, as a result of an incorrect application of the guidelines, or were outside the range of the applicable guidelines and were unreasonable." *United States v. Harris*, 932 F.2d 1529, 1536 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991) (citing 18 U.S.C. § 3742(e)). We must accept findings of fact unless clearly erroneous. *Id.* In sentencing defendants under the guidelines, "the [district] court is not bound by the rules of evidence and may consider any relevant information without regard to its admissibility provided the information considered has sufficient *indicia of reliability*." *United States v. Shacklett*, 921 F.2d 580, 584 (5th Cir.1991) (emphasis in original) (citing U.S.S.G. § 6A1.3(a)). "Any unadjudicated conduct considered in determining sentence must be supported by a preponderance of the evidence." *United States v. Mir*, 919 F.2d 940, 943 (5th Cir. 1990).

### 1.

■ Galvan filed written objections to the PSI, contending that there was no proof that she delivered cocaine and that the factual assertions in the PSI were not proven. She also objected to Agent Mitchell's account of the Herrera shooting, contained in the PSI, because Herrera had not been candid with Mitchell. She objected again on both bases at sentencing, and the

district court overruled both objections.[6]

■ We apply the pre-guidelines standard to the district court's reliance on the total drug quantities contained in the PSI. The drug totals were based on amounts of marijuana and cocaine discussed by Galvan and Salinas between August and October 1987. The source of the information is a court-approved wiretap of Salinas; the exact date and time of each telephone call are detailed in the PSI. The intercepted telephone calls on which the report (and subsequently the district court) relied contain more than adequate indicia of reliability to support the sentence. *Compare Shacklett*, 921 F.2d at 584 (drug total in PSI lacked sufficient indicia of reliability because source of facts was unidentified) (guidelines case).[7] Also, as the government points out, the lack of proof of any delivery of cocaine or marijuana is irrelevant, be-

cause Galvan was sentenced only on a drug *conspiracy* charge. Galvan's sentence for the drug offense was not an abuse of discretion.

■ Galvan likewise challenges the district court's reliance on agent Mitchell's report of the Herrera shooting contained in the PSI.[8] As noted, in reviewing this sentence based on the guidelines, we apply the 18 U.S.C. § 3742(e) clearly erroneous standard and examine whether the facts on which the district court relied had sufficient indicia of reliability. Galvan's only objection to Mitchell's report was that it was based on information supplied by Herrera and that Herrera had not been truthful regarding his handgun.[9] Moreover, the information narrated in the PSI as regards the shooting overlaps, virtually completely, with trial testimony heard by the district court. As it stated, the main issue as

---

**6.** The following dialogue occurred regarding the allegedly unproven amounts of drugs involved in discussions between Galvan and Salinas:

THE COURT: ... It was my understanding from the testimony that there was some discussion, although it never came to fruition—and from the videotape evidence— ... regarding marijuana and cocaine and whether or not Ms. Galvan could supply certain quantities. This was part of the video and part of the testimony ... given by Mr. Herrera ... regarding his attempts to make certain purchases and sales.

And I thought [the parts of the PSI at issue] went to that and to what ... the probation office claims to be the evidence of listening to those tapes and the conversation which was incorporated essentially, I suppose, in the testimony of Mr. Herrera. Did I miss something?

[DEFENSE COUNSEL]: No, your honor.

....

THE COURT: ... I think the first count in that situation involved a conspiracy count.... And I suppose the unfortunate aspect of any conspiracy is that the party who is engaged in it or engages in and does some affirmative act in it generally gets the benefit of having to carry the load equally with other coconspirators.

**7.** Galvan's contention that the district court "applied [its] understanding of the law of conspiracy to saddle [her] with the PSI's description of the 'Hernandez Organization,' without any evidentiary showing that [she] participated in, knew of or sanctioned any of the trafficking in cocaine or heroin to which the PSI made reference" is incorrect. The drug totals contained in the PSI were not derived from the activities of

unspecified Hernandez conspiracy members. Rather, they were adduced from government-monitored telephone conversations in which Galvan participated. Consequently, her assertion that the record lacked proof that she knew of the activities of her co-conspirators is unavailing; the only conduct at issue is her own. Likewise, her reliance on *United States v. Rivera*, 898 F.2d 442, 446 (5th Cir.1990) (guidelines sentencing), in which the "district court did not find that Rivera was aware of his co-defendants' participation in the heroin distribution scheme" is misplaced.

**8.** In objecting to the version of the Herrera shooting in the PSI, defense counsel stated:

[M]y objection was that apparently the probation office took these facts from the report of Agent Mitchell. However, there was testimony in the trial that Mr. Herrera was not candid with Agent Mitchell when he gave this information to him for the report, and that is our only objection there.

The district judge responded:

[A]lthough this is another person's language as it relates to how this is being presented to the Court, it seemed to me that this is essentially the same general facts as I heard them in court and during the course of the trial....

 .    .    .    .    .

I think that's just simply a question of credibility in that regard, and so the Court would overrule your objections....

**9.** Specifically, defense counsel objected because Herrera had said he and his roommate kept a handgun for protection, and Herrera's roommate refuted that testimony at trial.

regards the truthfulness of the PSI account is one of Herrera's credibility. The jury obviously credited Herrera's account of the shooting over Galvan's. And, it was entirely within the district judge's province to rely on Herrera's account in sentencing, resolving credibility questions as it saw appropriate. This information was sufficiently reliable.[10]

### 2.

Lastly, Galvan requests a sentencing hearing on all counts in the event that any are vacated by this court. Because her conviction and sentence must stand on all counts, this issue is moot.

### III.

For the foregoing reasons, Galvan's convictions and sentences are

AFFIRMED.

---

**10.** Moreover, because Galvan offered no rebuttal evidence, "[t]he district court ... was free to adopt the facts in the PSI without further inquiry." *United States v. Mir,* 919 F.2d 940, 943 (5th Cir.1990).