IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 90-3886
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WALTON AUCOIN, WILLIAM CONDON
and STEVEN BERTOLINO,

Defendants-Appellants,

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____
(June 22, 1992)

Before HIGGINBOTHAM, DUHE, Circuit Judges, and HUNTER[1], District
Judge

EDWIN F. HUNTER, JR., District Judge:

Appellants are admitted illegal bookmakers under state law[2]
but who challenge their convictions under 18 U.S.C. §1955
(operating an illegal gambling business) and 18 U.S.C. §1962(c)
(RICO collection of unlawful debt).[3]  At trial, hours of
conversations intercepted through court authorized electronic
surveillance, supported by expert and fact witness testimony, were

_____

[1]    District Judge of the Western District of Louisiana,
sitting by designation.

[2]    LSA-R.S. 14:90.

[3] There were other defendants in the case.  Connick, Fanning,
Abraham and Burke were found not guilty on all Counts.  Iris
Ethridge and Darlene Aucoin Toca accepted plea agreements.

presented which demonstrated that during the 1988-89 college and professional football season, appellants were operating a multi-million dollar interstate sports betting handbook in violation of state and federal law. Defendants advance a myriad of arguments on appeal. They challenged their convictions by arguing that §1962(c) and to a limited extent §1955(c) are unconstitutionally vague on their face as applied to their activities. They also insist that their sentencing under both §1955 and §1962 violated the double jeopardy clause. Additionally, they argue that the district court committed reversible error in failing to suppress betting sheets and certain conversations between Aucoin and his attorney which the district court held to be within the crime fraud exception to the attorney-client privilege.

We reject each of appellants' claims on appeal and affirm their convictions.

In September 1988, the Federal Bureau of Investigation ("FBI") and the New Orleans Police Department ("NOPD") initiated an investigation of a large sports bookmaking operation owned and operated by Walton Aucoin. The business was being conducted at the residence of his daughter, Darlene Aucoin Toca, in Jefferson Parish, Louisiana. Aucoin, along with Steven Bertolino, a part-owner of the business, and William Condon, a salaried employee, came to Darlene's house on a daily basis to use a four-phone rotary system that had been set up to take wagers.

In early October, Aucoin, Bertolino and Condon moved their operation to New Orleans. The United States made an application for a court-authorized wiretap on the four phones at the apartment

as well as the phone at Aucoin's residence, which also was being used in the gambling operation. Judge Carr approved the government's application. A wiretap was installed.

During the course of the electronic surveillance, thousands of gambling-related conversations were intercepted. These interceptions revealed that Aucoin, Bertolino and Condon were running a large-scale interstate sports bookmaking business, with customers in California, Oklahoma, Ohio and Virginia as well as throughout Louisiana. As bookmakers, they took bets primarily on college and professional football, from at least 80 customers. Fifteen of those customers bet $5000 a game. An FBI gambling expert, who analyzed the intercepted conversations, calculated that in one four-week period the business took in approximately $1.7 million.

The wiretap interceptions revealed the manner in which the business operated. Virtually every day, Aucoin would discuss the betting line and otherwise receive line information from Newport News, Virginia. Aucoin regularly exchanged line information with other bookmakers. These included individuals in Baton Rouge, Plaquemines, New Orleans and Lake Charles, Louisiana. These individuals also acted as sources for Aucoin to lay off bets if he had too many wagers on one side of a game.

On December 2, 1988, NOPD obtained a search warrant from the Criminal District Court in Orleans Parish. The warrant was executed on December 4, 1988 and Aucoin, Bertolino and Condon were arrested. The two room apartment contained a rotary telephone system, with

3

wire cutters across the lines, a television used to monitor games on which bets were being taken, and written material. This material consisted of books containing handwritten line information, sheets listing football wagers, and bottom sheets.

Bottom sheets record net amounts due and owing from the bookmaking operations' customers. At the time of his arrest, Aucoin asked NOPD officers on the scene for a copy of the bottom and wagering sheets. Aucoin told the officers that if he did not get the sheets, it would put him out of business because he would not know to whom he owed money or who owed money to him. This request was refused.

After being released on bond on the evening of December 4, Aucoin immediately began attempting to obtain copies of the seized bottom and wagering sheets. As he discussed with his daughter Darlene that evening:

> The most important thing is the papers. The papers could break me if they don't give me the papers back...Cause I got 80 people could tell me I owe'em anything....

He also phoned his friends Wilson Abraham and Paul Burke to ask them to contact New Orleans District Attorney Harry Connick on his behalf and request that he immediately get copies of these bookmaking papers. Aucoin explained to Burke on the night of December 4:

> Now if I don't get the papers back, Paul, that could break me. I mean...this could destroy me... All I want copies is that I can check bottoms with 80 customers...

4

Aucoin's calls with his attorney Patrick Fanning initially were minimized. However, on December 5, Aucoin related to Bertolino that Fanning told him he would get Aucoin's "papers back not by telling the DA you wanna check bottoms," but by relating the necessity of having the sheets to file his IRS wagering tax return. Aucoin originally thought this was not a good idea, because his tax return was not really due. He ultimately decided, however, that his lawyer's advise was correct and obtained copies of his papers on December 9. He used them to settle up with customers.

Immediately after the December 4 raid, the bookmaking enterprise relocated and moved back to Darlene Aucoin's house. The Jefferson Parish Police Department learned of this operation, contacted informants and obtained a search warrant. A raid was conducted on December 12. Bookmaking records were seized.

Soon after their release, appellants again re-established the bookmaking operation at Darlene's residence. NOPD learned of this and notified the Louisiana State Police ("LSP"). Search warrants on both Aucoin's residence and his daughter's home were issued. The warrants were executed on January 2, 1989. Aucoin, Bertolino, Condon and Claude Toups, a lookout, were arrested. Very few sheets with bets were found during the search. The majority were hidden in the attic under the insulation. These were retrieved after the police left.

### Section 1962(c) was Properly Applied to Appellants

Appellants argue that the district court violated rules of statutory construction in upholding their conviction under the

collection of unlawful debt prong of the RICO statute.

> Section 1962(c) of the RICO statute provides:
>
> > It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Liability under this section may be based on "either of `a pattern of racketeering activity,' or of `collection of unlawful debt.'" H. J., Inc. v. Northwestern Bell Telephone Company, 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989)(emphasis added).

> Subsection (6) of §1961 expressly defines "unlawful debt" as:
>
> > a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the law relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate. (emphasis supplied).

The collection by appellants of illegal gambling debts arising out of the Aucoin bookmaking business, which admittedly was operating in violation of Louisiana law, constitutes a violation of RICO. We decline appellants' invitation to jettison the clear language of the statute.

Contrary to their suggestion, the legislative history provides no support for their argument that additional requirements must be

6

read into the unlawful debt prong of the statute.  The House Report on the statute simply explains that the term "unlawful debt" includes debts incurred in connection with an illegal gambling business, and that the prohibition in §1962(c) against the conduct of the enterprise through the prohibited pattern of activity or collection of debt "is without exception." H. Rep. 91-1549, 91st Cong., 2d. Sess. reprinted in 1970 U.S.C.C.A.N. 4007, 4032-33. Lack of any  further elaboration by Congress does not provide a basis for "overrid[ing] the words of the statute." Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 495, 105 S.Ct. 3275, 3284 n.13, 87 L.Ed.2d 346 (1985)(refusing to limit RICO statutory language).

Appellants resort to the rule of lenity is unavailing.  "[T]he `touchstone' of the rule of lenity `is statutory ambiguity.'" Bifulco v. United States, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980);  Lewis v. United States, 445 U.S. 55, 65, 100 S.Ct. 915, 921, 63 L.Ed.2d 198 (1980).  The Supreme Court explained in United States v. Turkette, 452 U.S. 576, 587, 101 S.Ct. 2524, 2531 n.10, 69 L.Ed.2d 246 (1981), a case in which it declined to apply the rule of lenity to the RICO statute:

> [T]hat "rule," as is true of any guide to
> statutory construction, only serves as an aid
> for resolving an ambiguity; it is not to be
> used to beget one. . . .  The rule comes into
> operation at the end of the process of
> construing what Congress has expressed, not at
> the beginning as an overriding consideration
> of being lenient to wrongdoers.

See also, Taylor v. United States, 495 U.S. 575, 596, 110 S.Ct. 2143, 2157, 109 L.Ed.2d 607 (1990)(rule of lenity "cannot dictate

an implausible interpretation").[4]

In their briefs and oral argument, appellants insist that "the RICO statute must be read to require that any gambling-based RICO [collection of unlawful debt] prosecution using a state or local law crime as its predicate be one that carries a one-year jail term." They make this assertion even though they concede that the statute "literally" imposes no such requirement.

Appellants argue, by isolated references to the legislative history of RICO, that §1962(c) should be limited to large-scale, illegal gambling businesses that are part of organized crime. The Supreme Court has rejected just such attempts to extract from RICO's legislative history. The Court has noted, "RICO's language supplies no grounds to believe that Congress meant to impose such a limit on the Act's scope," and has pointed out that in those titles of the Organized Crime Control Act "where Congress did intend to limit the new law's application to the context of organized crime, it said so." H. J., Inc., 109 S. Ct. at 2903.

Appellants in this case operated an illegal gambling business that handled millions of dollars each year. It involved over 80 bettors in numerous states. More than 15 individuals were

---

[4] Appellants reliance on Yellow Bus Lines, Inc. v. Local Union 639, 913 F.2d 948 (D.C. Cir. 1990) (en banc) is misplaced. There, the D. C. Circuit focused on the participation element of §1962(c). The court referred in passing to the rule of lenity in holding that RICO could not be stretched so far as to allow Yellow Bus to civilly sue a union seeking recognition, by alleging in its complaint that Yellow Bus was the enterprise and the Union was participating in the conduct of its affairs. The court noted such a reading would "fly in the face of the statute's language and purpose." Id. at 955.

associated with the operation business. They were admittedly professional _illegal_ bookmakers. It is clear to us that Congress intentionally created a statutory scheme where proof of the collection of unlawful debt is a "_substitute_ for a showing that appellants engaged in two or more predicate acts forming a pattern of racketeering activity." United States v Eufrasio, 935 F.2d 553, 563 n.12 (3rd Cir.1991). Both, RICO and §1955 were enacted at the same time as part of a single legislative scheme, the Organized Crime Control Act of 1970. See Pub. L.91-452, §803 (codified as 18 U.S.C. §1955), §901 (codified as 18 U.S.C. §§ 1961 et seq). Section 1955 is expressly referenced in the RICO statute. Clearly Congress intended that the collection of unlawful debt prong and the pattern of racketeering prong should complement and not supersede one another. In RICO cases, defendants have been charged and convicted of violating both offenses.[5] See, e.g., United States v. Angiulo, 847 F.2d 956, 960 (1st Cir. 1988); United States v. Giovanelli, 945 F.2d 479, 486 (2d Cir.1991); Eufrasio,

---

[5] Counsel for the United States in oral argument summarized his position - utilizing this language:

> In essence, we just contend that what Congress wanted to do was to single out for special treatment the collection of unlawful debt through an organized enterprise. Congress believed that that had certain potential pernicious effects and that is why it set forth specific language in there in addition to the pattern racketeering language to deal with that.

This Court agrees with this characterization and analysis of Congressional intent. There is no ambiguity introduced by the fact that two parts of a single statute (the pattern of racketeering prong and the collection of unlawful debt prong) punish separate violations. United States v. Galvan, 949 F.2d 777 (5th Cir.1991).

935 F.2d at 557-58.

For similar reasons, appellants' argument that "because [they] were charged with violations of 18 U.S.C. 1955 in Count 2, they should have been prosecuted under the pattern of racketeering prong because it is more specific and because the penalty it imposes for gambling offenses is less severe," must be rejected. The fact that one statute prescribes a felony and the other prescribes a misdemeanor does not affect the prosecutor's authority to choose among statutes. United States v. Smith, 915 F.2d 959, 962 n.4 (5th Cir. 1990); United States v. Oldfield, 859 F.2d 392, 398 (6th Cir.1988)(quoting United States v. Schaffner, 715 F.2d 1099, 1102 (6th Cir.1983)); United States v. Cavada, 821 F.2d 1046 (5th Cir. 1987).

## Sections 1962(c) and 1955 are not Constitutionally Defective

Appellants press their contention that the RICO statute and §1955 are both void for vagueness on their face and as applied. This is true, they say, because "identical gambling offenses are treated entirely different depending on whether the Government elects to prosecute an individual under the pattern of racketeering prong of RICO or the unlawful debt collection prong of RICO." We reiterate again that, "when conduct violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants."[6] Moreover, a single statute may penalize more than one offense. United States

---

[6] Cavada, 821 F.2d at 1048 (quoting United States v. Batchelder, 442 U.S. 114, 123-24, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979)).

10

<u>v. Galvan</u>, 949 F.2d 777 (5th Cir.1991)(upholding consecutive sentences for defendant under §1512(a)(1)(A) and (C)).

Appellants would re-write RICO contending that "a violation of the unlawful debt collection prong of RICO should normally be punished <u>less</u> severally than the 18 U.S.C. §1955 violation." They claim the two prongs cannot be logically reconciled, because one provides a violation for a pattern of racketeering activity involving two §1955 violations and the other provides for a violation under the unlawful collection of debt. They insist that the "Government is attempting to punish one aspect of the gambling business (the collection of unlawful gambling debts) more severely than the entire gambling business." The short answer is that Congress decided that the collection aspect warrants a greater penalty. The fact that another statute is available is irrelevant.[7]

Next, appellants contend that RICO is unconstitutionally void for vagueness because "the collection of illegal gambling debts may not be an element of a local, state or federal gambling offense." Section 1961(6) clearly defines an unlawful debt as, <u>inter</u> <u>alia</u>, a debt "incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof. . . [and] which was incurred in connection with the business of gambling in violation of the law of the United

---

[7] Appellants reference to the Sentencing Guidelines misses the point. Congress chose to punish those persons participating in an enterprise through the collection of an unlawful debt stringently. The punishment is definite and certain. There is no vagueness.

States, a State or political subdivision thereof." Appellants knew they were operating a bookmaking business in violation of Louisiana law and admitted as much at trial. Their assertion that "[t]here is no provision of Louisiana or federal law that criminalizes the collection of gambling debts" is incorrect. Section 1955 prohibits the conducting of an illegal gambling enterprise and La. Rev. Stat. 14:90 penalizes the conducting of a gambling business. The collection of money owed on wagers is an essential part of the gambling business.

Finally, appellants contend that §1962(c) is unconstitutionally vague because it purportedly eliminates the need for criminal intent. The Indictment charged that they did "<u>knowingly and willfully</u> conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through the collection of unlawful debt ...." The jury was instructed that the crimes "charged require proof of specific intent before a defendant can be convicted," that "the Government must prove beyond a reasonable doubt that the defendant knowingly and willfully conducted or participated in the conduct of the affairs of the enterprise through the collection of an unlawful debt," and that the "Government must show that a defendant knowingly and willfully omitted or caused. . . at least one collection of the unlawful debt."

Appellants assert that "there was no criminal intent in the present case" and that they did not believe they were violating the law in collecting their bookmaking winnings. The jury found that

12

this was not true.

> "[W]here defendants know that their conduct is violative of state law, their wrongful purpose <u>ab initio</u>, established beyond a reasonable doubt, leaves them in no position to claim that they had no intention of violating a federal statute which, in fact, denounced the unlawful conduct as also constituting a federal crime. Defendants may have misunderstood the full reach of the federal statute but they deliberately took that risk when they set out upon a calculated violation of the laws of [the state]." <u>United States v. Thaggard</u>, 477 F.2d 626, 632 (5th Cir. 1973).

<u>The Conversations Between Aucoin and Counsel</u>

The district court conducted an in camera review of the conversations between Aucoin and his counsel. It rejected the invocation of the attorney-client privilege. The ruling was pegged on the crime-fraud exception because there was prima facie evidence that Aucoin had sought and obtained this advice in furtherance of criminal activities. The application of the attorney-client privilege is a question of fact to be determined in light of the purpose of the privilege and guided by judicial precedent. The clearly erroneous standard of review applies to the district court's factual findings. Fed.R.Civ.P. 52(a), <u>Byram v. United States</u>, 705 F.2d 1418 (5th Cir. 1983). We review the application of the controlling law de novo.

There were 25 intercepted conversations between Aucoin and counsel. The evidence presented to the district court constituted <u>prima</u> <u>facie</u> evidence that the crime-fraud exception applied. Aucoin admitted that he operated in violation of Louisiana law.

13

The jury subsequently found beyond a reasonable doubt that he violated RICO. The evidence demonstrated that Aucoin sought the return of his gambling records for the purpose of continuing to operate his illegal gambling business. His counsel, with knowledge of Aucoin's participation in illegal activity and desire to continue these activities, orchestrated a plan to obtain for the Aucoin gambling enterprise documents critically necessary to its continued operation and then assisted in the execution of this plan. Then, too, the excerpted conversations reveal that counsel, even after the return of Aucoin's records, assisted the enterprise in its efforts to insulate itself from further raids by local enforcement. Combining the contested conversations with intercepted conversations between Aucoin and others, concerning what advice he had been given by his lawyer, it was certainly proper and appropriate to apply the crime-fraud exceptions.

The district court's ruling, even if erroneous, would not suffice for reversal of Aucoin's conviction unless it affected a substantial right of his. <u>United States v. Scott</u>, 678 F.2d 606, 612 (5th Cir. 1982); <u>United States v. Moody</u>, 923 F.2d 341, 352 (5th Cir.1991), <u>cert denied</u>, 112 S.Ct. 80 (1991). In the context of suppression of evidence, the test for harmless error is "whether the trier of fact would have found the defendant guilty beyond a reasonable doubt [if the evidence had been suppressed]." <u>Moody</u>, 923 F.2d at 352.

This case is not "the `MAW' AND `PAW' operation down the street that operates out of the corner grocery store" as analyzed

by defense counsel during oral argument. There was overwhelming evidence of guilt. The primary evidence supporting the convictions was the intercepted conversations between Aucoin and his bettors and other bookmakers. Two of Aucoin's bettors testified that they placed bets with him and he collected the bets personally, or through others. The contested conversations were logically harmless, given the theory of defense. Defendants admitted conducting a million dollar illegal gambling operation. They merely contested whether that operation consisted of five or more people. The contested conversations primarily concern attempts to recover seized gambling records. They were therefore logically harmless to the jury's decision whether the Aucoin operation included five or more people. There was overwhelming evidence apart from the conversations with Fanning that Aucoin's operation involved at least 15 people.

## Convictions on Both Counts of the Indictment Did Not Violate Double Jeopardy [8]

Appellants argue that their conviction and sentencing under both RICO and §1955 violate the Double Jeopardy Clause of the constitution by punishing them twice for the same conduct. The Double Jeopardy Clause of the Fifth Amendment states that no person "shall be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. It is well settled that this clause protects against a double prosecution for the same

---

[8] Aucoin was sentenced to 15 months in prison as to Counts 1 and 2 to run concurrently. Condon and Bertolino were each sentenced to 6 months in prison to run concurrently.

15

offense. But it is equally well established that a defendant may be charged, convicted, and sentenced in the same case for violating a statute and a RICO predicated on that statute. E.g. United States v. Erwin, 793 F.2d 656, 669 (5th Cir. 1986); United States v. Phillips, 664 F.2d 971, 1009 n.55 (5th Cir. 1981); see also United States v. Pungitore, 910 F.2d 1084 (3d Cir. 1990)(affirming convictions of two defendants for violating §1955, collection of unlawful debt RICO, and pattern of racketeering RICO).  Thus, in the present case, the defendants' reliance on the Double Jeopardy Clause is misplaced.

The elements of the statutes differ.  The gambling statute requires proof that five or more persons were participating in the business, that the business was in substantially continuous operation for 30 days or more, or that the business had gross revenue of $2000 in any single day.  18 U.S.C. §1955(b)(1).  None of these elements are required to prove a RICO violation. Similarly, RICO requires proof that an enterprise existed, and that the person participated in the conduct of the enterprise through the collection of an unlawful debt.  18 U.S.C. §1962(c).  Although collection of debts is a necessary part of a gambling operation, debt collection is not a specified element of §1955.

The Gambling Records Seized From Aucoin

The United States introduced bottom sheets, books containing handwritten line information, and sheets with football wagers. These had been seized from Aucoin during searches conducted in December of 1988 and January of 1989.  The evidence, including

16

statements by Aucoin on recorded conversations, revealed that Aucoin used these materials to operate his illegal gambling business. Asserting his Fifth Amendment right against self-incrimination and citing 26 U.S.C. §4424, Aucoin sought the suppression of all the seized materials.

He voluntarily maintained the records for the purpose of the illegal gambling enterprise. He contended that the materials seized in the three raids in 1988 and 1989 were maintained by him for the purpose of complying with tax laws and that consequently their use in this prosecution was barred under the Fifth Amendment and §4424. The district court found that the records, "while they may have assisted [Aucoin] in preparing his tax return, were obviously maintained in addition as the basic business records of his alleged gambling enterprise." This was certainly correct. The records were not the type required to be kept for tax purposes. On their face, many of the documents seized from the gambling sites, such as the books containing line information obtained from other bookmakers, were unrelated to calculating wagers. The documents were used to set the betting odds and to keep track of wagers made by individual bettors, total amounts wagered on each side of each game, and the amounts to be collected or paid. The experienced vice investigators who examined the seized records agreed that they were the type of records maintained by bookmakers, and were essential to carrying on this illegal gambling business.

Once again, error, if any, from the introduction of the gambling records was harmless. See Arizona v. Fulminante, _____

17

U.S. _____, 113 L.Ed.2d 302 (1991).  The intercepted conversations and the testimony at trial conclusively demonstrated the operation of a large-scale gambling operation using numerous other persons to set his line, take bets, pay and collect from bettors, obtain line information and lay off excess bets.  There is no factual dispute in this case.  Appellants concede that the gambling business satisfied all the elements of §1955, except for the requirement that five or more people take part in conducting the business.  We reiterate, Aucoin's assertion that he, Bertolino, and Condon were the only persons involved in operating the illegal gambling business, is just not true.  The testimony and tape evidence conclusively showed that Darlene Aucoin, Iris Ethridge and many others provided services that were necessary or helpful to the gambling business, and that numerous persons regularly exchanged line information or took lay off bets from Aucoin.  see e.g., United States v. Jones, 712 F.2d 115, 120 (5th Cir. 1983); United States v. Colacurcio, 659 F.2d 684, 688 (5th Cir.1981), cert. denied, 455 U.S. 1002, 102 S.Ct. 1635, 71 L.Ed.2d 869 (1982); United States v. Tucker, 638 F.2d 1292, 1295 (5th Cir.1981), cert. denied, 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981).

We have reviewed each of defendants-appellants' arguments and find them to be without merit.  We affirm the judgments of sentence and conviction with respect to each.

AFFIRMED