**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

91-8649
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

FELMON LAKEITH LAURY,
a/k/a FELMON KEITH ASHLEY,
a/k/a WALTER RAY NICHOLSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Western District of Texas
_____

(March 2, 1993)

Before GOLDBERG, SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendant Felmon Lakeith Laury appeals his conviction for robbery of a bank by force and violence and by intimidation, in violation of 18 U.S.C. § 2113(a) (1988). Laury also challenges the district court's calculation of his sentence. Finding no error, we affirm.

**I**

On December 19, 1988, at approximately 12:15 p.m., an armed man entered Planters National Bank in Rosebud, Texas. The robber was wearing a pair of light-colored jeans, Puma tennis shoes, and a dark bandanna across his face. From atop a teller's counter, the robber demanded that the bank employees give him all of their

money. After forcing the bank employees into the vault, the robber left the bank with over $130,000, including $300 in dimes. The robber left a shoe impression on the countertop.

FBI agents received a tip from a confidential informant ("CI") that, according to one of Laury's friends, Laury robbed a bank in Rosebud, Texas in December 1988. In addition, the CI stated that Laury had recently purchased a number of expensive items, even though he was unemployed. The CI also stated that Laury was using an alias and identified Laury's place of residence. Based on the CI's information, FBI agents obtained a search warrant for Laury's residence.[1] Executing the search warrant, FBI agents seized a pair of light-colored jeans, a blue bandanna, a bag containing $189.60 in dimes, a pair of Puma tennis shoes, numerous purchase receipts, and a photograph of Laury displaying large sums of money. A special agent in the FBI laboratory compared the shoe print impression left by the robber with the tennis shoes found in Laury's apartment, and found that the two shared common

---

[1] Laury, who was not present during the execution of the search warrant, called the FBI's office upon learning of the search, and denied robbing the bank. Laury's uncontradicted testimony on direct examination was as follows:

A: I wanted to know what [the search] was about, and I called the FBI station that same day and I asked them))Well, I identified myself and told them who I was, and they told me they were looking for me for a bank robbery.
Q: Okay.
A: And I told them, "I'm not a bank robber." I told them, "I'm a thief, I don't rob banks."
Q: Okay.
A: I don't know how to rob a bank.
Q: Okay.
A: So he stated to me, "Well, if you didn't do it, [Laury], you know who did it." And I told him I don't, you know, and I left that there.

Record on Appeal, vol. 5, at 308.

characteristics. Laury was thereafter arrested. Immediately after he received his *Miranda* warnings, Laury told the FBI agents that he was the only adult male living in his apartment and all of the men's clothing belonged to him. He also admitted that he made numerous large cash expenditures between December 1988 and January 1989. He claimed he obtained his money from two jobs. In addition, Laury stated that his girlfriend, DeShannon Cooper ("Dinky"), who was on welfare, and Dinky's grandmother both gave him some of the money. Laury also informed the FBI agents that he had been in Calvert, Texas (near Rosebud) a few days before Christmas. Laury denied robbing the bank.

Laury was subsequently indicted for robbery by force and violence and by intimidation, in violation of 18 U.S.C. § 2113(a) (1988). Before trial, Laury moved to suppress the evidence seized from his apartment and the statements he made to FBI agents following his arrest. The district court denied both motions. At trial, Laury testified that he had obtained most of the money he spent by robbing a drug dealer of $19,000. Furthermore, Laury and three alibi witnesses testified that Laury was in Dallas, attending his cousin's birthday party on the date of the robbery. Laury also testified that one of his relatives owned the Puma tennis shoes. Nevertheless, the jury found Laury guilty.

At sentencing, the district court arrived at a total offense level of 26, and a criminal history category of VI. The district court denied Laury's objection to a two-point increase in his offense level for obstruction of justice. The district court

upwardly departed from the sentencing guideline range of 120-150 months because of Laury's recidivism and display of violence. Laury was sentenced to 175 months imprisonment, followed by three years of supervised release. In addition, Laury was ordered to pay restitution of $130,068.00, as well as a $50 mandatory assessment.

## II

Laury appeals his conviction and sentence, contending that:

(a) the district court erroneously submitted an aiding and abetting instruction to the jury;

(b) the prosecution improperly suggested that he and his witnesses should have come forward sooner with his alibi, depriving him of a fair trial;

(c) the evidence was insufficient to sustain the jury verdict;

(d) the prosecutor misstated the testimony of witnesses, depriving him of a fair trial;

(e) the district court erred in adding two points to his offense level for obstruction of justice;

(f) the district court abused its discretion in upwardly departing from the guidelines;

(g) the district court erred in denying his motion to suppress evidence seized from his residence; and

(h) the district court erred in denying his motion to suppress statements he made to FBI agents after his arrest.

## III

### A

Laury first alleges that the district court erred in instructing the jury that, under 18 U.S.C. § 2 (1988), whoever aids or abets the commission of an offense is punishable as the principal. Laury claims that the jury convicted him as the

principal pursuant to the aiding and abetting instruction,[2] even though there was insufficient evidence that the robber was aided and abetted.[3]  Therefore, Laury argues that his conviction should be reversed.

"The standard of review of a defendant's claim that a jury instruction was error is `whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law *applicable to the factual issues confronting them.'"  United States v. Ojebode,* 957 F.2d 1218, 1228 (5th Cir. 1992) (quoting *United States v. Stacey,* 896 F.2d 75, 77 (5th Cir. 1990)), *cert. denied,* 1993 U.S. LEXIS 1313 (Feb. 22, 1993).  The court "`may not instruct the jury on a charge that is not supported by the evidence.'"  *Id.* (quoting *United States v. Ortega,* 859 F.2d 327, 330 (5th Cir. 1988)).  After reviewing the record, we conclude that the aiding and abetting charge was supported by the evidence.  Laury testified that he did not rob Planters National Bank.  *See* Record on Appeal, vol. 5, at 319.  The bank vice-president testified that he felt that the bank robber must have had an accomplice.  *See* Record on Appeal, vol. 5, at 63-64.  The record shows that:  (1) Laury expended large amounts of

---

[2]    "`[T]he rule is well-established . . . that one who has been indicted as a principal may be convicted on evidence showing that he merely aided and abetted the commission of the offense.'"  *United States v. Walker,* 621 F.2d 163, 166 (5th Cir. 1980) (quoting *United States v. Bullock,* 451 F.2d 884, 888 (5th Cir. 1971)), *cert. denied,* 450 U.S. 1000, 101 S. Ct. 1707, 68 L. Ed. 2d 202 (1981).

[3]    Laury alleges that the aiding and abetting instruction effectively reduced the government's burden of proof.  In *Walker,* we rejected Laury's argument, stating that 18 U.S.C. § 2 simply "makes a defendant liable as a principal when he consciously shares in any criminal act."  *Walker,* 621 F.2d at 167.

cash following the date of the bank robbery; (2) clothing (Puma tennis shoes, a pair of light-colored jeans, and a blue bandanna) was found in Laury's apartment that was similar to the clothing the robber wore (Puma tennis shoes, a pair of grey or light-colored jeans, and a blue or black bandanna); (3) Laury initially stated to FBI agents that he owned the Puma tennis shoes seized from his apartment; (4) the shoeprint impression left by the robber corresponded in size, design, mold characteristics, and wear pattern with the Puma tennis shoes found in Laury's closet; and (5) $189.60 in dimes were found in Laury's apartment (the robber took $300.00 in dimes from the bank). Such evidence is sufficient to support the submission of an aiding and abetting instruction. Therefore, the district court did not err in submitting the aiding and abetting instruction to the jury.

Even assuming the district court erred in submitting the aiding and abetting instruction, the error was harmless. *See* 28 U.S.C. § 2111 (1988) (A judgment will not be reversed on account of error that is harmless.). Absent the aiding and abetting instruction, the jury still could have convicted Laury as the principal based on the same evidence that suggested he aided and abetted the robber.[4] The standard of review for judging the sufficiency of circumstantial evidence is "whether [, viewing the

---

[4] In addition to the aiding and abetting instruction, the district court instructed the jury that they could find Laury guilty as the principal of the robbery if they believed beyond a reasonable doubt that: (1) Laury "intentionally took money from the person or the presence of the person described in the indictment;" (2) "the money was then in the possession of a federally insured bank;" and (3) Laury "did so by means of force or violence or by means of intimidation." Record on Appeal, vol. 2, at 286, 290.

evidence in the light most favorable to the government,] a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Salazar,* 958 F.2d 1285, 1294 (5th Cir.), *cert. denied,* ___ U.S. ___, 113 S. Ct. 185, 121 L. Ed. 2d 129 (1992). Because a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt on each element of the offense, the district court's error, if any, in submitting the aiding and abetting instruction was harmless.

**B**

Laury claims that his rights to due process and against self-incrimination were violated because (1) the prosecution used his silence to impeach him at trial by suggesting that he should have come forward sooner with his alibi, and (2) the prosecution suggested that Laury's alibi witnesses should have come forward sooner with his alibi. At trial, Laury and his alibi witnesses testified that Laury was at his cousin's birthday party in Dallas on the date of the robbery. Neither Laury nor the witnesses told authorities about the alibi prior to trial.

**1**

The alleged improper comments occurred during the prosecutor's cross-examination of Laury and in his closing argument:

> Q: When did you call Mr. Farnsworth or Mr. Seale or anybody in the FBI and say, "Wait a minute, you've got the wrong guy, here's what really happened"? When did you do that?
> A: At no time.
> Q: When did you call the FBI, Mr. Seale, Mr. Farnsworth or the United States Attorney's office and say, "It

couldn't have been me on December the 19th, 1988, because
I was at a birthday party"?  When did you do that?
A:   I called the FBI agent))
Q:   Did you call him and tell him that you were
somewhere else on that day?
A:   I just told him that I didn't commit no robbery.
Q:   But you didn't tell him where you were, you didn't
tell him about your alibi?
A:   No, sir, and they didn't ask.
Q:   Waited until you get to court and that's when you're
going to have it all come out?
A:   Well, I feel like this, sir))
Q:   I'm not asking you how you feel, sir, just answer my
question.
A:   Repeat your question, sir.
Q:   You've been sitting where for the last several
months?
A:   Here in jail.
Q:   And you'd rather sit in jail than tell the FBI the
     truth, is that right?
A:   Well, actually since I've been sitting in jail,
there hasn't no FBI came to see me and))
Q:   You didn't call them and tell them you had this
alibi?
A:   I told my attorney.


Record on Appeal, vol. 5, at 327.  In his closing argument, the

prosecutor stated:

    When you look at all of the evidence, when you take
    everything together, . . . and you couple all of that
    together with the tennis shoes from the unbiased expert
    and you listen to the people that wanted to give him an
    alibi and couldn't remember who all was at the party,
    what everybody else was wearing, and didn't even
    remember))remember when Miss Cooper said that))that
    [Laury] came and got her in the middle of the party and
    then left.  None of the other witnesses said [Laury]
    left, said he was there all the time.  Yeah, they
    couldn't remember that.  They didn't tell the FBI he had
    an alibi.  He doesn't tell the FBI he has an alibi,
    there's no talk.

*Id.* at 373.

The prosecutor's interrogation of Laury[5] and his comment))"[h]e doesn't tell the FBI he has an alibi"))were sufficiently broad that they may be construed as commenting on Laury's failure to come forward with his alibi (a) prior to arrest, (b) immediately after his arrest and *Miranda* warnings, and (c) during the time period prior to trial but following his arrest.

### a

We first address whether any prosecutorial comment aimed at Laury's pre-arrest silence was improper. There is no constitutional violation where the prosecution uses pre-arrest silence to impeach a criminal defendant because "no governmental action [has] induced [the defendant] to remain silent." *Jenkins v. Anderson,* 447 U.S. 231, 240, 100 S. Ct. 2124, 2129-30, 65 L. Ed. 2d 86 (1980); *see also United States v. Collins,* 972 F.2d 1385, 1408 n.48, 1409 & n.50 (5th Cir. 1992), *petitions for cert. filed,* (U.S. Dec. 4, 1992) (No. 92-6813) and 61 U.S.L.W. 3446 (U.S. Dec. 7, 1992) (No. 92-964); *United States v. Cardenas Alvarado,* 806 F.2d 566, 572 (5th Cir. 1986). Therefore, any constitutional claim that the prosecution improperly commented on Laury's pre-arrest silence has no merit.

### b

Insofar as the prosecutor's comments may be construed as commenting on Laury's failure to come forward with his alibi

---

[5]  Although Laury answered the prosecutor's questioning by bringing up his pre-*Miranda* phone call to the FBI, the prosecutor's initial questions were much broader and not limited to the period prior to Laury's arrest. Furthermore, the prosecutor referred to Laury "sitting in jail," which was a clear reference to the post-arrest, post-*Miranda* time period.

immediately following his arrest, we must determine whether the prosecutor attempted to impeach Laury with silence, which is not permissible, or inconsistent statements, which is permissible.

In *Doyle v. Ohio,* 426 U.S. 610, 96 S. Ct. 610, 49 L. Ed. 2d 91 (1976)*,* the Court held that the due process clause prohibits impeachment of a defendant's exculpatory story by using the defendant's immediate post-arrest, post-*Miranda* warnings silence.[6] *Id.* at 619, 96 S. Ct. at 2245. *Doyle* involved two defendants who, subsequent to their arrest and *Miranda* warnings, declined to make a statement.[7] *See id.* at 611-14, 96 S. Ct. at 2241-43. At trial, the defendants presented an alibi that they had not previously disclosed to authorities. *See id.* at 613, 96 S. Ct. at 2242. On cross-examination, the prosecutor questioned the defendants about their failure to disclose their alibi to the police following their arrest. *See id.* at 2243 & n.5, 96 S. Ct. at 613, 614 & n.5, 615 (The Court held that the cross-examination violated the due process clause.). "The Court's conclusion in [*Doyle*] was based on the

---

[6]     *The Court stated:*

   *Silence in the wake of these [Miranda] warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.*
*Doyle,* 426 U.S. at 617-18, 96 S. Ct. at 2244-45 (citation omitted).

[7]     Following his arrest, one of the defendants made statements such as "I don't know what you are talking about." *Doyle,* 426 U.S. at 614 n.5, 96 S. Ct. at 2243 n.5. The Court treated the statements as being tantamount to silence. *See id.* at 617-19, 96 S. Ct. at 2244-45.

-10-

ambiguity inherent in a defendant's silence after he has been arrested and informed of his *Miranda* rights. A defendant's silence may indicate that he is exercising the rights of which he has just been advised; it does not necessarily mean that a defendant does not have an exculpatory story to tell." *Cardenas*, 806 F.2d at 572.

However, in *Anderson v. Charles*, 447 U.S. 404, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980), a defendant voluntarily gave a statement to the police, after arrest and *Miranda* warnings, and then told a different story at trial. *Id.* at 405-09, 100 S. Ct. at 2180-83. There the Court held that the prosecutor could properly question the defendant about his prior inconsistent statements. *See id.* at 409, 100 S. Ct. at 2183. In *Anderson,* the defendant, charged with murder, gave the police a post-arrest statement describing the location from which he had stolen the victim's car. *See id.* at 405, 100 S. Ct. at 2180. At trial, however, the defendant testified that he had stolen the car from a different location. *See id.* On cross-examination, the prosecution asked the defendant why he had not previously disclosed the latter version of events, thereby suggesting that this latter version was a recent fabrication. *See id.* at 405-06, 100 S. Ct. at 2181. The Court held that *Doyle* did not prohibit the prosecutor's cross-examination because "`[t]he questions were not designed to draw meaning from silence [as in *Doyle*], but to elicit an explanation for a prior inconsistent statement.'" *Id*. at 409, 100 S. Ct. at 2182.

Although "`virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle*

violation,'" a prosecutor's comments must be evaluated in context. *United States v. Blankenship,* 746 F.2d 233, 238 (5th Cir. 1984) (quoting *United States v. Shaw,* 701 F.2d 367, 381-82 (5th Cir. 1983), *cert. denied,* 465 U.S. 1067, 104 S. Ct. 1419, 79 L. Ed. 2d 744 (1984)). We stated in *Shaw* that:

> The alternative tests for determining whether a prosecutor's or witness's remarks constitute comment on a defendant's silence are whether the "manifest intent" was to comment on the defendant's silence or, alternatively, whether the character of the remark was such that the jury would "naturally and necessarily" construe it as a comment on the defendant's silence. Both the intent of the prosecutor and the character of the remarks are determined by reviewing the context in which they occur, and the burden of proving such intent is on the defendant.

*Id.* at 381 (citations omitted) (footnotes omitted).

Although Laury made post-arrest statements to FBI agents, he did not discuss his whereabouts during the robbery.[8] Therefore, nothing Laury told the FBI agents was inconsistent with his trial testimony that he was at a party on the date of the bank robbery. The prosecutor did not comment on what Laury told FBI agents, but on what he did not tell them. Jurors would naturally and necessarily view the prosecutor's line of questioning on cross-examination, as well as his statement in closing argument, as an

---

[8] Laury told FBI agents: (1) he was the only man living in his apartment; (2) he lived with his girlfriend, Dinky; (3) he owned the men's clothing in the apartment; (3) when and where he purchased the items described in purchase receipts; (4) he purchased the items with money that he obtained from two jobs, Dinky, and Dinky's grandmother; (5) he was in Calvert, Texas a few days before Christmas; and (6) he did not rob Planters National Bank.

The arresting officer, Agent Farnsworth, stated on direct examination that Laury did not make any statements concerning his whereabouts on the date of the robbery. *See* Record on Appeal, vol. 4, at 187-88 (In response to the prosecutor's question, "Did [Laury] give you any kind of alibi or any excuse or any place that he was on December the 19th of 1988," Agent Farnsworth stated, "No sir. He just simply denied that he had robbed that bank.").

-12-

attack on Laury's credibility. On cross-examination, the prosecutor suggests an implausible scenario))that Laury would prefer to languish in jail than tell the FBI about his alibi. Clearly the prosecutor meant to suggest that Laury's alibi was not disclosed prior to trial because it was not true, for the prosecutor's comments could not have served any other purpose. Therefore, the prosecutor's "manifest intent" was to comment on Laury's post-arrest silence with regard to his alibi. Only "[w]hen a defendant chooses to contradict his post-arrest statements to the police . . . [does] it become[] proper for the prosecutor to challenge him with those [post-arrest] statements and with the fact that he withheld his alibi from them." *Lofton v. Wainwright,* 620 F.2d 74, 78 (5th Cir. 1980). Because Laury's post-arrest and trial statements were not inconsistent, we view the prosecutor's comments as comments on Laury's post-arrest silence,[9] and therefore in violation of *Doyle*.[10]

---

[9] We have not found any analogous cases where the prosecution attempted to impeach the defendant with post-arrest and trial statements that were not inconsistent. The relevant cases are either a clear *Doyle* case))where the defendant remained completely silent following arrest, but gave an exculpatory story at trial, *see, e.g., Shaw,* 701 F.2d at 382, or a clear *Anderson* case))where the defendant gave a statement to the police, and then gave a clearly inconsistent story at trial. *See, e.g., Brogdon v. Butler,* 838 F.2d 776, 781 (5th Cir. 1988); *Lofton,* 620 F.2d at 76.

[10] The government claims that the prosecutor's comments did not violate *Doyle*, because Laury did not remain completely silent following his arrest. We do not believe, however, that the Supreme Court in *Doyle* intended that a defendant remain *completely* silent following arrest in order to rely on the protection of the due process clause. In fact, the Court in *Doyle* did not treat the defendant's post-arrest comments as a waiver of his right to remain silent. *Doyle,* 426 U.S. at 614 n.5, 96 S. Ct. at 2243 n.5. That Laury did not remain completely silent following his arrest did not give the prosecutor unbridled freedom to impeach Laury by commenting on what he did *not* say following his arrest.

-13-

We normally review *Doyle* violations for harmless error. *Chapman v. United States,* 547 F.2d 1240, 1248-49 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S. Ct. 1705, 52 L. Ed. 2d 393 (1977); *see also United States v. Carter,* 953 F.2d 1449 (5th Cir.), *cert. denied,* ___ U.S. ___, 112 S. Ct. 2980, 119 L. Ed. 2d 598 (1992); *Cardenas Alvarado,* 806 F.2d at 572-73. However, because Laury failed to object to the prosecutor's comments at trial, we review the prosecutor's comments for plain error. *See Carter,* 953 F.2d at 1463; *Cardenas Alvarado,* 806 F.2d at 573. "Plain error is error so great that it cannot be cured at trial; the error `must be obvious, substantial, and so basic and prejudicial that the resulting trial lacks the fundamental elements of justice.'" *United States v. Davis,* 831 F.2d 63, 66 (5th Cir. 1987) (quoting *United States v. Birdsell,* 775 F.2d 645, 653 (5th Cir. 1985), *cert. denied,* 476 U.S. 1119, 106 S. Ct. 1979, 90 L. Ed. 2d 662 (1986)). We will reverse only to prevent a grave miscarriage of justice. *Carter,* 953 F.2d at 1463; *Cardenas Alvarado,* 806 F.2d at 573.

Despite any improper prosecutorial comments on Laury's immediate post-arrest silence, the record contained sufficient evidence of Laury's guilt. *See* discussion *supra* part III.A. Therefore, the prosecutor's error was not substantial or so prejudicial that Laury's trial lacked the fundamental elements of justice. The prosecutor's comments did not constitute plain error.

**c**

The prosecutor's comments were also aimed, in part, at Laury's failure to come forward with his alibi while he was in jail prior

to trial.  *See* Record on Appeal, vol. 5, at 327 (Prosecutor asked

Laury on cross-examination:   "And you'd rather sit in jail than

tell the FBI the truth . . . ?").   The prosecutor's "manifest

intent" was to comment on Laury's silence, and thereby raise an

inference that his alibi was a recent fabrication.  *See Carter,* 953

F.2d at 1464.   ("The purpose behind the [prosecutor's comments] is

apparent:   the prosecutor clearly hoped that [the defendant's

silence prior to trial, although he was languishing in jail for two

and a half months,] would raise the inference that [his exculpatory

story] was a recent fabrication.").   However, *Doyle* did not decide

whether comments on a defendant's failure to give an alibi *anytime*

prior to trial is unconstitutional.  *See id.,* 426 U.S. at 616 n.6,

96 S. Ct. at 2244 n.6; *Carter,* 953 F.2d at 1464.   *Doyle* involved

impeachment by silence immediately following arrest, just after

*Miranda* rights were given and while the defendant was in the

custody of the arresting officers.   Nevertheless, we held in *Carter*

that a *Doyle* violation does occur where the prosecution comments on

the defendant's failure to give an alibi prior to trial but

subsequent to the time of arrest.[11]   *See Carter,* 953 F.2d at 1464;

*but see United States ex rel. Smith v. Howe,* 746 F.2d 386, 387-88

---

[11]    In *Carter,* we distinguished between classic *Doyle* violations))where
the prosecution comments on a defendant's silence immediately following arrest,
and non-classic *Doyle* violations))where the prosecution comments on a defendant's
later post-arrest silence.   *See Carter,* 953 F.2d at 1464.   We stated that
"Supreme Court decisions have clarified that the *Doyle* protection derives
primarily from the implicit assurance of the *Miranda* warnings and thus is
strongest in the context of immediate post-*Miranda* warning interrogation."  *Id.*
Consequently, we held that the usual harmless-error standard used to determine
whether classic *Doyle* violations constitute reversible error, *see Chapman,* 547
F.2d at 1248-49, does not apply to non-classic Doyle violations.  *See Carter,* 953
F.2d at 1464.   Rather, non-classic *Doyle* violations are reviewed for plain error.
*Id.*

(7th Cir. 1984) (citing *Fletcher v. Weir,* 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982)) (no *Doyle* violation where there was no indication that defendant had received *Miranda* warnings prior to post-arrest silence), *cert. denied,* 471 U.S. 1104, 105 S. Ct. 2335, 85 L. Ed. 2d 852 (1985). Therefore, the prosecutor's comments satisfy this Circuit's test for a comment on the defendant's silence, in violation of *Doyle*. *See Carter,* 953 F.2d at 1464. However, for the reasons set forth in the preceding subsection, the prosecutor's comments did not constitute plain error.

**2**

Laury seeks relief based on other instances of alleged prosecutorial misconduct. Laury claims that the prosecutor violated his due process rights by cross-examining his alibi witnesses on their failure to come forward sooner with his alibi, and by commenting on the alibi witnesses' silence in his closing argument.[12] Because Laury did not object to the prosecutor's

---

[12] Ethel Curry, Henry Lee Laury, and Annette Curry were Laury's alibi witnesses. One alleged instance of prosecutorial misconduct arose out of the prosecutor's cross-examination of Ethel Curry:

> Q:   [W]hen he was arrested and charged with this crime, did you go to the police and tell them that it couldn't have been him because he was at a birthday party?
> A:   No.
> Q:   When was the first time that you told))went and told the police or the FBI that it couldn't have been him because he was at this birthday party?
> A:   I didn't.  They came by my house.

Record on Appeal, vol. 4, at 199-200. Laury also claims that the prosecutor made improper comments during his cross-examination of Henry Lee Laury:

> Q:   Mr. Laury, when did you go to the police and tell them that [Laury] couldn't be guilty of this case, that he had an alibi?
> A:   I didn't never talk to no police.
> Q:   Well, do you know))how long has he been arrested and charged with this?
> A:   I don't know how long he's been arrested and charged, because I wasn't here.

-16-

comments at trial, "we will reverse only if the comment[s] rise to the level of plain error, *i.e.,* if the error is `obvious, substantial, and so basic and prejudicial that the trial lacks the fundamental elements of justice.'" *Carter,* 953 F.2d at 1460 (quoting *United States v. Simpson,* 901 F.2d 1223, 1227 (5th Cir.

---

Q:    Well))
A:    I was in the state penitentiary myself.
Q:    Well, we'll get to that in a minute.  But how long have you known that he's been charged with this bank robbery?
A:    I just))I was in the penitentiary when I found out what he was in there for.  They just told me he went to report and they locked him up, that's all I know about this.
Q:    Well, how many times have you talked to him since he's been here in Waco, Texas?
A:    I talked to him on))talked to him and his girlfriend on the phone.
Q:    Well, how many times?
A:    One or two times.  I don't keep up with no phone calls.
Q:    Well, over the last period of time))how long have you known that he's been charged with this crime?
A:    I'm telling you I was in the penitentiary, came home and found out he was in here.
Q:    Well, when did you get out of the penitentiary?
A:    I got out of the penitentiary in May.
Q:    In May of when?
A:    `91.
Q:    And so you've known since May of `91 that he was charged with it?
A:    Yeah, I've known it since then.
Q:    Okay.  And when did you go to the FBI and tell them it couldn't have been him because he was at this birthday party?
A:    I haven't talked to a FBI or city official or county or nobody.
Q:    You didn't tell anybody.
A:    I haven't talked to nobody.

*Id.* at 208-09.  The prosecutor also asked Annette Curry about her failure to come forward with Laury's alibi:

Q:    When did you call the police and tell them that it couldn't have been [Laury] that did this robbery because he was with you?
A:    Who called the police?
Q:    Did you?
A:    No.
Q:    You hadn't ever called the police or the FBI?
A;    No.
Q:    Well, how long have you known he's been charged with this crime?
A:    When the lawyer))I guess the DA or whoever he is))came over to the apartment to talk to me that day.

*Id.* at 218.  In addition, the prosecutor in his closing argument commented on the witnesses' silence:  "[The alibi witnesses] didn't tell the FBI that [Laury] had an alibi."  *Id.*, vol. 5, at 373.

-17-

1990)).  It is permissible for a prosecutor to "take the wind out of the defendant's sails regarding [a] witness' credibility." *United States v. Handly,* 591 F.2d 1125, 1128 n.1 (5th Cir. 1979). The prosecutor's comments regarding the failure of the witnesses to come forward sooner with Laury's alibi was a permissible attack on their credibility.[13]  Therefore, the prosecutor's comments did not amount to error, plain or otherwise.  Even if, arguendo, the prosecutor's comments were improper, in light of all the evidence presented at trial that indicated Laury's guilt, *see* discussion *supra* part III.A., we do not find that the prosecutor's comments were so prejudicial that the trial lacked the fundamental elements of justice.

## C

Laury argues that the evidence was insufficient to sustain the jury's verdict because the prosecution only presented circumstantial evidence, and never produced a witness that could

---

[13]  *See United States v. Johns,* 734 F.2d 657, 664-665 (11th Cir. 1984). In *Johns,* the defendant argued that the prosecutor improperly commented on the failure of his alibi witness to come forward sooner with his alibi. *See id.* at 663.  The court stated:  "That anyone, defendant *or witness,* fails to present a defendant's alibi to law enforcement at the earliest time possible has some logical negative reflection on the credibility of the alibi defense." *Id.* (emphasis added).  In holding that the prosecutor's comment did not amount to misconduct the court stated:

> The [issue] is whether for some policy reasons we should not allow the prosecutor to present otherwise admissible evidence to the jury. For example, when a defendant does not tell police his alibi, we prohibit such argument for *Miranda* reasons. *See Doyle v. Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). *We find no similar policy that would prevent our allowing the prosecutor to attack an alibi witness' credibility by pointing out that he did not come forward until trial.*

*Id.* at 664-65 (emphasis added).

-18-

identify him as the robber.[14] The usual standard of review for judging the sufficiency of evidence in a circumstantial evidence case "is not whether the evidence excludes every reasonable hypothesis of innocence or is wholly inconsistent with every conclusion except that of guilt, but whether [, viewing the evidence in the light most favorable to the government,] a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Salazar,* 958 F.2d 1285, 1294 (5th Cir.), *cert. denied,* ___ U.S. ___, 113 S. Ct. 185, 121 L. Ed. 2d 129 (1992). However, because Laury failed to move for either a directed verdict at the close of the government's evidence or a judgment of acquittal following the trial, we review his insufficiency of the evidence claim under a much stricter standard. *See United States v. Galvan,* 949 F.2d 777, 782 (5th Cir. 1991); *United States v. Ruiz,* 860 F.2d 615, 617 (5th Cir. 1988). "`We are limited to the determination of "whether there was a manifest miscarriage of justice." Such a miscarriage would exist only if the record is "devoid of evidence pointing to guilt," or . . . "because the evidence on a key element of the offense was so tenuous that a conviction would be shocking."'" *Galvan,* 949 F.2d at 783 (quoting *Ruiz,* 860 F.2d at 617). "In making this determination, the evidence, as with the regular standard for review of insufficiency of evidence claims, must be considered `in

---

[14] Laury also argues that the government failed to prove that the offense occurred in the Western District of Texas. Because Laury never objected to venue before the district court, this objection is waived. *See Keene v. International U. of Operating Eng., Local 624, AFL-CIO,* 569 F.2d 1375, 1378 (5th Cir. 1978) ("Unlike jurisdiction, venue can be waived.").

-19-

the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices.'" *Ruiz,* 860 F.2d at 617 (quoting *United States v. Hernandez-Palacios,* 838 F.2d 1346, 1348 (5th Cir. 1988)), *quoted in Galvan,* 949 F.2d at 783.

After reviewing the record, we find that it contains an abundance of evidence pointing to guilt. *See* discussion *supra* part III.A. Accordingly, no manifest miscarriage of justice has been shown in finding Laury guilty of robbery.

**D**

Laury alleges that the prosecutor mischaracterized the testimony of his witnesses, depriving him of his constitutional right to a fair trial. Because Laury failed to object to the prosecutor's comments at trial, we review the statements for plain error. *See United States v. Davis,* 831 F.2d 63, 66 (5th Cir. 1987).

Laury argues that the prosecutor, in his closing argument, improperly inferred that Dinky admitted that Laury owned the Puma tennis shoes seized from his apartment. In closing argument, an attorney may "assist the jury in analyzing, evaluating, and applying the *evidence*." *United States v. Morris,* 568 F.2d 396, 401 (5th Cir. 1978). Accordingly, "[a]n attorney may state to the jury the inferences and conclusions he wishes them to draw" as long as they are based on the evidence. *Davis,* 831 F.2d at 66; *see also Morris,* 568 F.2d at 401 (During closing argument, an attorney has a "right to state his contention as to the conclusions that the

jury should draw from the evidence."). Although the jury could have reasonably concluded from the prosecutor's summation of the evidence that Dinky admitted that Laury owned the shoes, the prosecutor did not tell the jury that they should draw that conclusion.[15] The prosecutor merely restated Dinky's testimony to support his argument that Laury owned the tennis shoes. Because the prosecutor properly assisted the jury in evaluating Dinky's testimony, we find no error.

Laury also claims that the prosecutor mischaracterized the testimony of his witnesses by stating that they testified that Laury had been present at his cousin's party the entire time, even though Dinky testified that Laury left the party to pick her up. *See* Record on Appeal, vol. 5, at 372-73 ("[R]emember when [Dinky] said that))that [Laury] came and got her in the middle of the party and then left. None of the other witnesses said [Laury] left, said he was there all the time."). Although the prosecutor was correct that none of these witnesses testified that Laury had left the party, he misstated these witnesses' testimony, because no one

_____

[15] Dinky testified that Laury did not own or wear tennis shoes. *See* Record on Appeal, vol. 5, at 273, 280-81. On cross-examination, however, Dinky identified a government exhibit as a photograph of Laury in her house wearing tennis shoes. *See id.* at 283. Dinky also identified another exhibit as a photograph of tennis shoes in her hall closet. *See id.* at 284-85. The prosecutor asked Dinky whether Laury owned the shoes in the closet, and she responded affirmatively. *See id.* During closing argument, the prosecutor stated: Dinky says, `[Laury] doesn't even own tennis shoes, he doesn't wear tennis shoes. I don't know anything about tennis shoes.' Well, she hadn't seen the photographs until today. She looks at the photographs and says, `Oh, yeah, those are tennis shoes. Oh, yeah, they're in the hall closet. Oh, yeah, those are his shoes on his feet in the picture.'" *Id.* at 351.

testified that Laury was at the party the entire time.[16] Despite the prosecutor's error, after reviewing the record, we find that the record contained sufficient evidence of Laury's guilt. *See* discussion *supra* part III.A. Accordingly, we find that the prosecutor's error was not so prejudicial that Laury's trial lacked the fundamental elements of justice. Therefore, the prosecutor's error did not amount to plain error.

**E**

Laury next contends that the district court erred in adding two points to his base offense level for obstruction of justice.[17] *See* United States Sentencing Commission, *Guidelines Manual,* § 3C1.1 (West rev. ed. August, 1988). The district court found that Laury obstructed justice when he (1) lied under oath as to the source of the money he spent following the date of the bank robbery, and (2) lied to the probation officer preparing the presentence report about a prior arrest and conviction.[18]

---

[16] The government claims that the prosecution did not mischaracterize the witnesses' testimony, arguing that "[t]he prosecutor was attempting, by his argument to highlight the inconsistency between [Dinky's testimony that Laury had left the party to pick her up] and Henry Lee Laury, Jr.'s testimony that [Laury] stayed at the party from `about a quarter to 11 . . . until about two or three.'" Brief for United States at 20-21. We disagree because none of the witnesses, including Henry Lee Laury, stated that Laury was at the party all the time. We construe the prosecutor's statement that "[n]one of the other witnesses said [Laury] left, said he was there all the time" to mean "[n]one of the other witnesses said [Laury] left, [they] said he was there all the time." The other possible construction))"[n]one of the other witnesses said [Laury] left, [none] said he was there all the time [either]))in the context of the prosecutor's argument does not make sense.

[17] Laury was sentenced under the guidelines in effect at the time the offense was committed.

[18] The probation officer made these findings in the presentence report, and consequently, recommended that the district court adjust Laury's sentence for obstruction of justice. Because the district court expressly adopted the factual findings in the presentence report, *see* Record on Appeal, vol. 2, at 325, we

-22-

Section 3C1.1 instructs the district court to enhance a defendant's offense level by two points "[i]f the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense." The section is not designed to punish a defendant for exercising a constitutional right, and "[a] defendant's denial of guilt is not a basis for application of this provision." U.S.S.G. § 3C1.1, comment. (n.3). An enhancement may be appropriate where a defendant "testif[ies] untruthfully or suborn[s] untruthful testimony concerning a material fact." *Id.,* comment. (n.1(c)). In applying section 3C1.1, the district court should evaluate alleged untruthful testimony "in a light most favorable to the defendant." *Id.*, comment. (n.2). We review a district court's determination that a defendant has obstructed justice under section 3C1.1 for clear error. *United States v. Bethley,* 973 F.2d 396, 402 (5th Cir. 1992), *cert. denied,* 1993 U.S. LEXIS 1483 (Feb. 22, 1993); *United States v. Paden,* 908 F.2d 1229, 1236 (5th Cir. 1990), *cert. denied,* ___ U.S. ___, 111 S. Ct. 710, 112 L. Ed. 2d 699 (1991).

The district court found that Laury obstructed justice by testifying untruthfully as to the source of the money he spent))in excess of $26,000 in cash))following the date of the bank robbery. It is proper for the district court to enhance a defendant's sentence for obstruction of justice where the defendant committed perjury by giving false testimony at trial. *See United States v.*

_____

treat the findings as those of the district court.

*Dunnigan,* 1993 U.S. LEXIS 1779, at *11-*17 (Feb. 23, 1993) (upholding obstruction of justice enhancement where district court disbelieved defendant's trial testimony that she was not involved in a conspiracy); *United States v. Goldfaden,* 959 F.2d 1324, 1331 (5th Cir. 1992) (upholding obstruction of justice adjustment where defendant gave perjurious testimony); *United States v. Velasquez-Mercado,* 872 F.2d 632, 636 (5th Cir.) (upholding two-point adjustment where district court found that defendant committed perjury, because it disbelieved defendant's claim at sentencing that he did not have a leadership role in recruiting undocumented aliens), *cert. denied,* 493 U.S. 866, 110 S. Ct. 187, 107 L. Ed. 2d 142 (1989).  In *Dunnigan,* the Supreme Court defined perjury as follows:  "A witness testifying under oath or affirmation [commits perjury under section 3C1.1] if the witness gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory."  *Id.,* 1993 U.S. LEXIS at *14.  The Supreme Court also stated that if a defendant objects to an obstruction of justice enhancement resulting from the defendant's trial testimony, the district court must review the evidence and "make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out."  *Id.* at 16.  In making its findings it is preferable for the district court to make a separate and clear finding on each element of the alleged perjury.  *Id.*  It is sufficient, however, if the district court "makes a finding of

-24-

obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury." *Id.* at 16.[19]

In his post-arrest statement, Laury claimed that he had obtained the money from two jobs, and that both Dinky and her grandmother had given him some of the money. *See* Record on Appeal, vol. 4, at 185-86 (direct examination of Agent Farnsworth). Laury told Agent Farnsworth that he had no other source of income. *See id.* at 185, 188. At trial, however, Laury stated for the first time that he had obtained most of the money by robbing a drug dealer of $19,000. *See id.,* vol. 5, at 292. In finding that Laury committed perjury, and thereby obstructed justice, the district court stated: "Obviously if the jury's verdict means anything, then Mr. Laury did commit perjury when he testified, and I believe the jury's verdict means exactly what it found." Record on Appeal, vol. 6, at 6 (transcript of sentencing proceeding).[20] In addition, the court found that "[i]f the jury had been convinced that [Laury]

_____

[19]    The Supreme Court held that the district court's finding of obstruction of justice was sufficient where the district court stated:

> The court finds that the defendant was untruthful at trial with respect to material matters in this case. The defendant denied her involvement when it is clear from the evidence in the case as the jury found beyond a reasonable doubt that she was involved in the conspiracy alleged in the indictment, and by virtue of her failure to give truthful testimony on material matters that were designed to substantially affect the outcome of the case, the court concludes that the false testimony at trial warrants an upward adjustment by two levels.

*Dunnigan,* 1993 U.S. LEXIS at *16-*17.

[20]    Laury argues that "[t]he [d]istrict court did not make any independent factual finding that [he] lied in his trial testimony, but rather relied completely and solely upon the [guilty] verdict." Brief for Laury at 24. Laury's argument is meritless because the district court expressly adopted the factual findings in the presentence report. *See* Record on Appeal, vol. 2, at 325.

had obtained the money as he indicated, it may have affected the determination of guilt. Statements made by the defendant were made in an effort to obstruct or impede the administration of justice during prosecution." Presentence Report at 5. The district court's finding that Laury committed perjury was sufficient. *See Dunnigan,* 1993 U.S. LEXIS at *17. Furthermore, because the record supports the district court's finding that Laury committed perjury, the district court did not clearly err in finding that Laury had obstructed justice.[21]

The district court also found that Laury obstructed justice by lying to the probation officer preparing the presentence report about a prior arrest and conviction. A defendant's offense level may be enhanced where the defendant "furnish[es] material falsehoods to a probation officer in the course of a presentence report or other investigation for the court." U.S.S.G. § 3C1.1, comment. (n.1(e)). During the presentence interview, the probation officer asked Laury about a prior arrest and conviction arising out

---

[21] Laury also argues that an obstruction of justice enhancement based on perjury infringes on his constitutional right to testify. We disagree. The Supreme Court in *United States v. Dunnigan,* 1993 U.S. LEXIS 1779, at *17-*18, *22 (Feb. 23, 1993), expressly held that an obstruction of justice enhancement based on perjury does not interfere with a defendant's right to testify: "Upon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines. That requirement is consistent with our precedents and is not in contravention of the privilege of an accused to testify in [the accused's] own behalf." *Id.* at *22; *see also United States v. Collins,* 972 F.2d 1385 (5th Cir.) (holding that enhancement for obstruction of justice based on perjury does not infringe on a defendant's right to testify), *petitions for cert. filed,* (U.S. Dec. 4, 1992) (No. 92-6813) and 61 U.S.L.W. (U.S. Dec. 7, 1992) (No. 92-964); *Goldfaden,* 959 F.2d at 1331 ("Though the court may not penalize a defendant for denying his guilt as an exercise of his constitutional rights, an enhancement based upon perjury is permissible.")

of an incident in Houston.  Laury denied any involvement.  Laury stated that it was his uncle who was involved in the incident, and that the uncle used Laury's name when arrested.  Subsequently, the probation officer obtained a photograph of the person arrested, which clearly revealed that it was Laury.  Because the record supports the district court's finding that Laury lied to the probation officer preparing the presentence report, the district court did not err in finding that Laury obstructed justice.  *See Velasquez-Mercado,* 872 F.2d at 636 (upholding obstruction of justice adjustment where district court found that defendant had lied to probation officer preparing presentence report).

**F**

Laury next claims that the district court erred in upwardly departing from the sentencing guidelines.  The district court sentenced Laury to 175 months imprisonment, 25 months above the sentencing guidelines maximum.[22]  A departure from the sentencing guidelines will be upheld if (1) the district court provided acceptable reasons for the departure, and (2) the extent of the departure was reasonable.  *United States v. Fields,* 923 F.2d 358,

---

[22]     Laury's criminal history score of 20 points placed him in criminal history category VI, the highest possible category under the sentencing guidelines.  Based on Laury's criminal history category and offense level of 26, the guidelines recommended a sentence of 120-150 months.
We note that section 4A1.3 of the guidelines was amended on November 1, 1992.  *See United States v. Lambert,* No. 91-1856, 1993 WL 35719, at *6 (5th Cir. Feb. 16, 1993) (en banc).  "According to the amendment, [when] a district court intends to depart above Category VI, it should still stay within the guidelines by considering sentencing ranges for higher base offense levels.  This amendment emphasizes the Commission's concern for systematic, uniform sentences even in cases where a departure is appropriate."  *Id.*

361 (5th Cir.), *cert. denied,* ___ U.S. ___, 111 S. Ct. 2066, 114 L. Ed. 2d 470 (1991).

Laury argues that the district court's upward departure was unreasonable because it was based on a factor (Laury's criminal history) already taken into account by the guidelines. The presentence report stated that Laury had been convicted seven times for offenses involving theft and burglary in a span of six years. The presentence report also showed that Laury repeatedly violated parole and probation. Adopting the factual findings of the presentence report, the district court stated that it was upwardly departing because of Laury's "constant recidivism and displaying of violent behavior." Record on Appeal, vol. 2, at 325. Thus, the district court upwardly departed because Laury's criminal history category did not adequately reflect the seriousness of his past criminal conduct. We review this finding of fact for clear error. *See United States v. Roberson,* 872 F.2d 597, 607 (5th Cir. 1989), *cert. denied,* 493 U.S. 861, 110 S. Ct. 175, 107 L. Ed. 2d 131 (1989). We review the district court's decision to depart upward from the guidelines for abuse of discretion. See *Roberson,* 872 F.2d at 601.

That a defendant's criminal history category does not adequately reflect the seriousness of a defendant's past criminal conduct "is a factor *not* taken into account by the Guidelines and is a permissible justification for upward departure." *United States v. Geiger,* 891 F.2d 512, 514 (5th Cir. 1989) (emphasis added) (upholding upward departure where defendant's criminal

-28-

history category did not adequately reflect seriousness of defendant's criminal history), *cert. denied,* 494 U.S. 1087, 110 S. Ct. 1825, 108 L. Ed. 2d 954 (1990), *overruled on other grounds United States v. Lambert,* No. 91-1856, 1993 WL 35719, at *1 (5th Cir. Feb 16, 1993) (en banc); *see also Roberson,* 872 F.2d at 606 (same). In fact, the Commission itself stated that "[a] departure . . . is warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." U.S.S.G. § 4A1.3, p.s.. Furthermore, the Commission stated that it "contemplates that there may, on occasion, be a case of egregious, serious criminal record in which even the guideline range for a category VI criminal history is not adequate to reflect the seriousness of the defendant's criminal history." *Id.*

Given Laury's past criminal convictions, the district court did not clearly err in finding that Laury's criminal history category did not adequately reflect the seriousness of his criminal history. Furthermore, because Laury's criminal history points (20) were well above the minimum required (13) to place him in a category of VI, and the district court gave adequate reasons for its upward departure, the district court did not abuse its discretion in upwardly departing from the sentencing guidelines.

Laury's challenge to the extent of the district court's departure is equally unavailing. Because the departure was within the statutory limit, *see* 18 U.S.C. § 2113(a) (1988), we will review it only for a "`gross abuse of discretion.'" *United States v.*

*Huddleston,* 929 F.2d 1030, 1031 (5th Cir. 1991) (quoting *United States v. Juarez-Ortega,* 866 F.2d 747, 748 (5th Cir. 1989)). "If the district finds that it is necessary to go beyond the guidelines, the court must give adequate reasons why the guideline calculation is inadequate and why the sentence it imposes is appropriate." *Lambert,* 1993 WL at *5. In light of the district court's articulated reasons for the departure))Laury's constant recidivism and display of violence))we do not view a 25-month upward departure to a 175-month sentence for a crime with a maximum statutory sentence of 240 months as unreasonable. *See, e.g., United States v. Fields,* 923 F.2d 358, 361 (5th Cir.), *cert. denied,* ___ U.S. ___, 111 S. Ct. 2066, 114 L. Ed. 2d 470 (1991) (upholding departure of 24 months to a 204-month sentence for a crime with a minimum statutory sentence of 180 months and maximum of life).

### G

Laury contends that the district court erred in denying his motion to suppress the evidence obtained from the search of his apartment. Laury contends that the affidavit in support of the search warrant did not establish probable cause because: (a) the affidavit was based on conclusory statements and unreliable hearsay; (b) the affidavit did not establish a nexus between Laury's home and the instrumentalities and evidence of the robbery; and (c) the information provided by affiant Agent Garcia and the CI was stale. We disagree.

In reviewing a district court's denial of a motion to suppress, we engage in a two-part inquiry: (1) whether the good-faith exception to the exclusionary rule applies, *see United States v. Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984); and (2) whether the warrant was supported by probable cause. *United States v. Satterwhite,* 980 F.2d at 317, 320 (5th Cir. 1992); *see also United States v. Webster,* 960 F.2d 1301, 1307 (5th Cir.), *cert. denied,* ___ U.S. ___, 113 S. Ct. 355, 121 L. Ed. 2d 269 (1992). We need not, however, address the probable cause issue if the good-faith exception applies, and the case does not involve a "`novel question of law whose resolution is necessary to guide future action by law enforcement officers and magistrates.'" *Illinois v. Gates,* 462 U.S. 213, 264, 103 S. Ct. 2317, 2346, 76 L. Ed. 2d 527 (1983) (White, J., concurring); *Satterwhite,* 980 F.2d at 320 (quoting *Gates*). This case does not present a novel question of law. Therefore, we address the good-faith issue first.

The Supreme Court in *Leon* held that evidence obtained by officers in objectively reasonable good-faith reliance upon a search warrant is admissible, even though the warrant was unsupported by probable cause. *See Leon,* 468 U.S. at 922-23, 104 S. Ct. at 3420; *Satterwhite,* 980 F.2d at 1640. Where a warrant is supported by more than a bare bones affidavit,[23] an officer may rely in good faith on the warrant's validity. *Id.; Pigrum,* 922 F.2d at 252. We review de novo the reasonableness of an officer's reliance

_____

[23] A bare bones affidavit contains "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Satterwhite,* 980 F.2d at 321.

upon a warrant issued by a magistrate. *Satterwhite*, 980 F.2d at 321 (citing *United States v. Wylie,* 919 F.2d 969, 974 (5th Cir. 1990)).

Laury first claims that the warrant was not supported by probable cause because it was based solely upon a bare bones affidavit. We disagree. The affidavit shows that eyewitnesses to the robbery provided a description of the robber which was similar to Laury's.[24] *See* Record on Appeal, vol. 1, at 157-58. The affidavit also states:

> A confidential source who has provided reliable information in the past to local law enforcement officers and whose information has culminated in three arrests and three convictions furnished the following information to which he had access:
>
> 1.    A personal friend of Felmon Lakeith Laury stated that Laury robbed a bank in Rosebud, Texas during December, 1988.
>
> 2.    Felmon Lakeith Laury is unemployed and has been for some time. However, in late December, 1988, Laury purchased a 1982, two-door, white Lincoln Continental with a tan "convertible look" vinyl top. He also purchased a yellow Chevrolet Z.28 Camaro for his girlfriend. Around Christmas, 1988, Laury went to Houston with another black male and purchased expensive clothes, and had a $1,500 stereo installed in his car.

---

[24]    Laury argues that the affidavit did not establish probable cause because it "include[d] information that the Defendant was not the one who committed the instant offense, namely that he did not match the description given by the eyewitnesses to the crime." *See* Brief for Laury at 32. Eyewitnesses to the robbery described the suspect "as being a black male in his late 20's, approximately 5'10" to 6' tall, approximately 150 pounds, slim build, short black hair, with large eyes." Record on Appeal, vol. 1, at 158. The affidavit states that Laury is "a black male, 25 years old, 5'8" tall, weighs 140 pounds, has a slender build, short black hair and large eyes." *Id.* at 157. Laury's attempt to discredit the affidavit by pointing out discrepancies between the two descriptions is frivolous because the eyewitness description was only an approximation. *See Greer v. Turner,* 639 F.2d 229, 230 n.1, 232 & n.4 (5th Cir. 1981) (where defendant pointed out that eyewitnesses described robber as about 6'2" and he was only 5'11", defendant's attempt to discredit the description provided by eyewitnesses was frivolous because the description was only an approximation).

Laury also gave some of his friends $100 each as a Christmas gift.

3.    Felmon Lakeith Laury is currently using an alias of Walter Ray Nicholson.

4.    Felmon Lakeith Laury was raised in the Calvert, Texas area near Rosebud, Texas and frequently travels to that area.

5.    Felmon Lakeith Laury currently lives with his girlfriend DeShannon "Dinky" Cooper at the Estell Village Apartments, 5938 Highland Village Drive, Apartment #D, Dallas, Texas.   Laury has lived there since December, 1988.

*Id.* at 157.  The CI's statements provided the magistrate with ample facts, not conclusions, for finding that there was a fair probability that Laury robbed a bank.

Laury further alleges the government is attempting to put flesh on an otherwise bare bones affidavit by the use of unreliable hearsay.  Laury avers that Agent Garcia and the CI had no personal knowledge of the robbery, and that the CI did not reveal the underlying facts and circumstances of how he obtained the information.

An affidavit may rely on hearsay))information not within the personal knowledge of the affiant, such as an informant's statement))as long as the affidavit presents a "`substantial basis for crediting the hearsay.'"  *Gates,* 462 U.S. at 242, 103 S. Ct. at 2334 (quoting *Jones v. United States,* 362 U.S. 257, 269, 80 S. Ct. 725, 735, 4 L. Ed. 2d 697 (1960)); *see also Draper v. United States,* 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959); *Satterwhite,* 980 F.2d at 321.   In determining whether an informant's report is credible, we examine the informant's veracity

and basis of knowledge.  *See Gates,* 462 U.S. at 230-33, 103 S. Ct. at 2328-29.  These factors are relevant considerations under the "totality of the circumstances" test for valuing an informant's report.  *See id.*  "[A] deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."  *Id.* at 232, 103 S. Ct. at 2329.

The affidavit adequately demonstrated the CI's veracity.  The veracity of an informant is often assessed from the accuracy of previous tips.  *See United States v. Barbin,* 743 F.2d 256, 259 (1984).  Agent Garcia stated that the CI in the past had furnished reliable information to local law enforcement officers leading to three arrests and three convictions.  These statements sufficiently established the CI's veracity.  *See United States v. McKnight,* 953 F.2d 898, 905 (5th Cir.), *cert. denied,* ___ U.S. ___, 112 S. Ct. 2975, 119 L. Ed. 2d 594 (1992) (assertion that informant in the past had given true and reliable information sufficiently established veracity); *Barbin,* 743 F.2d at 256 (veracity was established where informant in the past had given information resulting in several arrests and convictions); *United States v. Almas,* 507 F.2d 65, 66 n.1 (5th Cir. 1975) (veracity established where informant had provided information leading to four arrests and four convictions).

The affidavit also sufficiently demonstrated the CI's basis of knowledge.  "An informant's basis of knowledge can . . . be established by a particularly detailed tip."  *United States v.*

*Jackson,* 818 F.2d 345, 349 (5th Cir. 1987). The CI knew where Laury lived, the name of Laury's girlfriend, Laury's use of an alias, and where Laury was raised. Furthermore, the CI knew with specificity expenditures that Laury made in December 1988. In addition, the affidavit stated that an FBI agent had verified the residence of Laury's girlfriend. While the source of the CI's information was not disclosed, nor how the information was obtained, the detailed facts given were of such a nature, in light of the surrounding circumstances, that the magistrate could have reasonably concluded that the CI obtained the information in a reliable manner. Therefore, the CI's tip, given his past accuracy and the detailed information he furnished, provided the magistrate with a substantial basis for crediting the CI's statements.

Laury also claims that the affidavit was based on unreliable double hearsay because some of the CI's statements were based on information given to the CI by an unidentified personal friend. *See* Record on Appeal, vol. 1, at 157. Laury argues that the affidavit failed to establish the personal friend's veracity and basis of knowledge. Although it is true that the affidavit did not establish the personal friend's veracity, we are not precluded from determining that a substantial basis existed for crediting the personal friend's statement. *See Gates,* 462 U.S. at 232, 103 S. Ct. at 2329 ("A deficiency in [either veracity or basis of knowledge] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."); *see also Satterwhite,* 980

F.2d at 322 ("Where an informant's report is not based on personal knowledge, but rather on the information of a second individual, we must determine whether a substantial basis exists for crediting the second individual's information." (citing *Spinelli,* 393 U.S. at 410, 89 S. Ct. at 584, 593 (White, J., concurring)).

First, the personal friend did more than merely state that Laury had robbed a bank. The personal friend correctly identified Rosebud as the place of the robbery and December 1988 as the month and year the robbery took place. This is even more significant because both the CI and Laury lived in Dallas: it is unlikely that the CI would know about, and implicate Laury in, a bank robbery in the distant town of Rosebud. Second, the personal friend's statements were corroborated by the CI's statements. "`It is enough . . . that [c]orroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing a `substantial basis for crediting the hearsay.'" *Id.* at 322-23 (quoting *Gates,* 462 U.S. at 244-45, 103 S. Ct. at 2335). The CI stated that Laury was raised near Rosebud and frequently traveled to that area. The CI's statement corroborates the personal friend's claim that Laury robbed a bank by connecting Laury to the area of the bank robbery. Therefore, the affidavit provided the magistrate with a substantial basis for crediting the personal friend's statement.

Laury further alleges that the affidavit was totally lacking in indicia of probable cause because it did not establish a nexus between Laury's home and the instrumentalities and evidence of the

robbery.  The affidavit must contain facts which "establish a nexus between the house to be searched and the evidence sought." *United States v. Freeman,* 685 F.2d 942, 949 (5th Cir. 1982).  This nexus "may be established through . . . normal inferences as to where the articles sought would be located." *Id.* "`For instance, evidence that a defendant has stolen material which one would normally expect him to hide at his residence will support a search of his residence.'" *Id.* (quoting *United States v. Maestas,* 546 F.2d 1177, 1180 (5th Cir. 1977)).

The instrumentalities and evidence of the crime were not found at the scene of the crime.[25]  Furthermore, Agent Garcia stated in the affidavit that, based on his training, experience, and participation in the investigation of over 200 bank robberies, "[i]ndividuals who commit bank robberies tend to keep evidence and instrumentalities of their robberies in their personal possession, as well as their homes." Record on Appeal, vol. 1, at 160. Therefore, the affidavit furnished the magistrate with enough information to conclude that there was a nexus between Laury's home and the instrumentalities and evidence of the robbery.  *See United States v. Pace,* 955 F.2d 270, 277 (5th Cir. 1992) (Where agent stated in affidavit that individuals who cultivate marijuana routinely conceal evidence of the crime in their homes, court held:

---

[25]    The government sought to obtain two basic types of items from Laury's residence: (1) instrumentalities of the crime (tennis shoes, loot bag, jacket, bandanna, gloves, revolver, jeans); and (2) evidence of the crime (coin bag containing dimes, money straps, wooden money dividers, currency). *See* Record on Appeal, vol. 1, at 153.

"The expectation of finding evidence of the crime at the suspect's home, *given that such evidence was not found at the scene of the illegal activity,* was a reasonable inference which supported the magistrate's determination of probable cause to search the residence."); *see also United States v. Thomas,* 973 F.2d 1152, 1157 (5th Cir. 1992) ("Since [the] criminal instruments were not found at the scene of Thomas's business, the expectation of finding the [criminal instruments] at Thomas's home was a reasonable inference supporting a determination of probable cause.").

Laury also contends that the information supporting the search warrant was stale. "[T]he amount of delay which will make information stale depends upon the particular facts of each case, including the nature of the criminal activity and the type of evidence sought." *Freeman,* 685 F.2d at 951. "`A mechanical count of days is of little assistance in [the] determination.'" *Id.* (quoting *United States v. Hyde,* 574 F.2d 856, 865 (5th Cir. 1978)). The FBI agent stated in his affidavit that individuals who commit bank robberies tend to keep instrumentalities and evidence of the offense in their homes and that "investigations [that he has] conducted have revealed that often this evidence and instrumentalities of these crimes are kept for long periods of time, up to and including a period of several years." Record on Appeal, vol. 1, at 160. Also, less than two months elapsed from the date of the robbery to the issuance of the warrant. Therefore, it was reasonable for the magistrate to conclude that the information forming the basis of the warrant was not stale. *See*

-38-

*United States v. Barfield,* 507 F.2d 53, 57-58 (5th Cir.), *cert. denied,* 421 U.S. 950, 95 S. Ct. 1684, 44 L. Ed. 2d 105 (1975) (upholding search warrant issued forty days after information as to the location of stolen coins and burglary tools was received by the government).

**H**

Lastly, Laury argues that the district court erred in denying his motion to suppress incriminating statements made after his arrest because he did not voluntarily waive his *Miranda* rights. After holding a hearing on Laury's motion to suppress, the district court held that Laury made a voluntary and intelligent waiver of his rights after receiving *Miranda* warnings. "`[I]n reviewing a trial court's ruling on a motion to suppress based on live testimony at a suppression hearing, the trial court's factual findings must be accepted unless clearly erroneous, or influenced by an incorrect view of the law . . . .'" *United States v. Ibarra,* 965 F.2d 1354, 1356 (5th Cir. 1992) (en banc) (equally divided court) (quoting *United States v. Muniz-Melchor,* 894 F.2d 1430, 1433-34 (5th Cir.), *cert. denied,* 495 U.S. 923, 110 S. Ct. 1957, 109 L. Ed. 2d 319 (1990)); *see also United States v. Cagle,* 849 F.2d 924, 924 n.1 (5th Cir. 1988) (citing *United States v. Maldonado,* 735 F.2d 809, 814 (5th Cir. 1984)). Furthermore, the evidence must be viewed in the light most favorable to the party that prevailed below. *Id.* (quoting *Muniz-Melchor,* 894 F.2d at 1433-34); *Cagle,* 849 F.2d at 924 n.1 (citing *Maldonado,* 735 F.2d at 814). Defendants may waive their *Miranda* rights provided that they

-39-

waive their rights voluntarily, knowingly, and intelligently. *United States v. McClure,* 786 F.2d 1286, 1288 (5th Cir. 1986). In determining whether defendants have validly waived their *Miranda* rights, the court must take into account the "totality of the circumstances surrounding the interrogation." *Id.* at 1289 (quoting *Moran v. Burbine,* 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). At the hearing, FBI agents testified that they had properly advised Laury of his constitutional rights and that he knowingly and voluntarily waived these rights. *See* Record on Appeal, vol. 3, at 5-11. The FBI agents stated that Laury was advised of his constitutional rights when he was initially arrested. The agents also testified that later, at the police station, they again informed Laury of his rights, and had him read out loud from a written advice of rights form. At that point, testified an agent, Laury indicated that he had no reservations about talking to the agents.[26] *See* Hearing on Pre-Trial Motions at 7. Agents also stated that Laury answered affirmatively after being asked multiple times whether he had been informed of his rights. In his brief in support of his motion to suppress, Laury alleged in conclusory fashion that his statements were coerced, but did not point to any supporting evidence. Furthermore, nothing in the record suggests that Laury's statements were compelled. Therefore, the district court's did not clearly err in finding that Laury made a voluntary and intelligent waiver of his *Miranda*

---

[26] At the bottom of the advice of rights form, there is a notation that Laury "[r]efused to sign [the waiver of rights], but agree[d] [to] talk to [a]gents." *Id.* at 192.

-40-

rights. Consequently, the district court did not err in denying Laury's motion to suppress.

**IV**

For the foregoing reasons, we **AFFIRM**.